The **CHILDREN'S ALLIANCE;**
et al., Plaintiffs,

v.

The **CITY OF BELLEVUE, Defendant.**

No. C95–905Z.

United States District Court,
W.D. Washington.

Jan. 8, 1997.

Michael Mirra, Columbia Legal Services, Tacoma, WA, for Plaintiffs.

Lori Molander, David E. Kahn, Bellevue City Attorney's Office, Bellevue, WA, Stephen A. Smith, Preston Gates & Ellis, Seattle, WA, for Defendant.

## ORDER

ZILLY, District Judge.

THIS MATTER comes before the Court on plaintiffs' motion for summary judgment and defendant's motion for partial summary judgment, docket nos. 24 and 39. The Court has reviewed the pleadings in support of and in opposition to these motions as well as the supplemental briefing submitted, and considered the parties' oral argument at the hearing on November 1, 1996. The parties waived further oral argument after the status conference on December 12, 1996. The Court now GRANTS summary judgment on plaintiffs' claims under the Fair Housing Act, 42 U.S.C. § 3601 et seq., and the Washington Law Against Discrimination, RCW § 49.60.010 et seq., and DENIES defendant's motion for partial summary judgment for the reasons stated in this Order. The Court holds that City of Bellevue Ordinance No. 4861 violates the Fair Housing Act and the Washington Law Against Discrimination.

## BACKGROUND

This Order incorporates by reference the background and history of this litigation contained in the Court's Order dated November 1, 1996, docket no. 74.[1] In Washington State, group-care facilities for children, like other types of group homes, are subject to state licensing requirements. RCW 74.15. The children in these facilities usually are abandoned, abused, or neglected; have mental health problems or developmental disabilities; require treatment for drug or alcohol abuse; or are finishing their sentence for a juvenile offense. Oreskovich Decl., docket no. 47, ¶ 7. Placement of children in group homes arises by court transfer of custody to the State Department of Social and Health Services (DSHS), court transfer to a licensed child-placement agency, or by written consent of the legal custodian. *Id.* ¶ 6.

Between 1994 and 1996 the City of Bellevue ("Bellevue") enacted three ordinances related to the establishment of group-care facilities. Bellevue passed Ordinance No. 4697, requiring group-home operators to register with the City, in 1994. Bellevue repealed this ordinance effective April 4, 1996. In 1994 Bellevue also enacted Ordinance No. 4696–A, which, among other things, prohibited all group housing for children in residential areas. This ordinance was later held to be invalid by the Central Puget Sound Growth Management Hearings Board because the Board concluded that the ordinance treated facilities for handicapped children differently than other facilities in violation of RCW 36.70A.410. Exhibits in Support of Plaintiffs' Motion, docket no. 36, Exhib. 21 at 15.

Bellevue enacted the third ordinance, No. 4861 (the "Ordinance"), in 1996 to replace Ordinance No. 4696–A. Plaintiffs' Motion, App. C, docket no. 24. Significantly, the new ordinance removes the provision banning outright all youth homes from residential areas. The Ordinance continues, however, to draw distinctions in the treatment accorded group-care facilities based upon their placement in either Class I or Class II. The Ordinance's definition of "Group Facility" is extremely

1. Since the issuance of that Order, the Court has granted the United States government leave to file a brief as amicus curiae in this action, docket no. 82. The Court has also considered this brief.

broad: "A staffed living facility for a group of persons, which may include both children and adults...." All detention facilities and temporary shelters for the homeless are excluded from the definition of "Group Facility." Adult family homes, Group Facilities solely for people with a handicap, domestic violence shelters, and foster family homes fall within Class I. The Ordinance relegates all other Group Facilities to Class II.

Both Class I and Class II homes can locate in residential zones, but Class II facilities cannot do so if they (1) are not operated by resident staff; (2) accept occupants for fewer than thirty days; and (3) house non-handicapped individuals who are dangerous because of violent, sexually deviant behavior, current substance abuse, or because they have committed a serious crime. Unlike Class I homes, those in Class II are subject to a permitting requirement which allows area residents to have an opportunity to comment on the proposed facility.

Ordinance No. 4861 defines "Family" as "[o]ne or more persons (but not more than six unrelated persons) living together as a single housekeeping unit." Thus group-care facilities fall within the definition of "Family" provided they have fewer than seven residents. Nonetheless, the Ordinance could prevent these same group homes from locating in any residential neighborhood if, for example, it is a group home for youths which accepts short-term residents.

The Ordinance imposes occupancy limits on any Group Facility located in residential districts R–1 through R–7.5. Group homes are limited to six Residents, defined as those assigned sleeping quarters in the facility, not more than two caretakers, plus the minor children of the Residents and caretakers. Additionally, the Ordinance mandates at least 1000 feet between Group Facilities of the same type, other than domestic violence shelters or foster family homes.

As a result of Bellevue's recent ordinances regulating group-care facilities, there are only four beds for homeless youth in all of Bellevue. Henning Decl., docket no. 30, ¶ 2. In 1994 Bellevue was able to house five of its forty-five homeless youths placed in group homes, and only fourteen of fifty-four in 1995. Id.[2] The record reflects that there are *no* Class II facilities in Bellevue, *see* Terry Decl., docket no. 56, ¶ 5, Smith Decl., docket no. 60, Exhib. A, at 3, and that the Ordinance's restrictions deter placement of group homes for youths in the city. Cousineau Decl., docket no. 29, ¶ 9; Campbell Decl., docket no. 26, ¶ 7.

## ANALYSIS

### I. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute is "material" only if it could affect the outcome of the litigation, and the dispute is "genuine" only if the evidence could lead a reasonable jury to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In order to defeat a summary judgment motion, the nonmovant may not "rest upon the mere allegations or denials" in its pleadings, Fed.R.Civ.P. 56(e), but must demonstrate the existence of facts that could support a jury finding in its favor. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510–11. Summary judgment should therefore be entered against a party that has failed to produce evidence concerning an element on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The court must make all inferences and resolve all ambiguities in favor of the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

---

2. These numbers do not include homeless youths turned away due to lack of space, of which there were 861 in King County in 1994. The record does not reflect how many of these 861 children were from Bellevue. The numbers given also probably undercount the number of placed children originally from Bellevue. Henning Decl. ¶ 2.

## II. Fair Housing Act

Plaintiffs invoke three sections of the Fair Housing Act ("FHA"), those found at 42 U.S.C. §§ 3604, 3615, 3617, to support their request for an order invalidating the Ordinance.

### A. 42 U.S.C. § 3604

■ Plaintiffs claim that the Ordinance violates the FHA by making dwellings unavailable on account of the familial status and the handicaps of residents. *See* 42 U.S.C. §§ 3604(a), 3604(f)(1).[3] The FHA defines "familial status" as:

[O]ne or more individuals (who have not attained the age of 18 years) being domiciled with—

(1) a parent or another person having legal custody of such individual or individuals; or

(2) the designee of such parent or other person having such custody, with the written permission of such parent or other person.

The protections afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years.

42 U.S.C. § 3602(k).[4] A "handicap" is:

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

(2) a record of having such impairment, or

(3) being regarded as having such an impairment, but such term does not include

current, illegal use of or addiction to a controlled substance.

42 U.S.C. § 3602(h).[5]

■ Plaintiffs use two analytical tools to demonstrate that the Ordinance violates 42 U.S.C. § 3604: disparate treatment and disparate impact. The latter is the appropriate theory were the Court to find the Ordinance neutral on its face. *See Larkin v. State of Michigan Dept. of Soc. Serv.*, 89 F.3d 285, 289 (6th Cir.1996); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir.1995). Because the Court considers the Ordinance facially discriminatory, however, it will only analyze the Ordinance under the disparate treatment framework.[6]

### 1. Finding Discrimination in the Ordinance's Language

■ In order to make out a prima facie violation of the FHA under disparate treatment theory, a plaintiff needs to show that the defendant expressly treats members of a protected group differently than others who are similarly situated. *Bangerter*, 46 F.3d at 1501. Differential treatment on the face of an ordinance demonstrates an intent to discriminate; additional evidence of discriminatory animus is not required. *Id.* at 1500–01. Thus a court undertaking a disparate treatment analysis must focus on the specific language used in an ordinance. *Cf. International Union, United Auto, Aerospace and Agric. Implement Workers of America v. Johnson Controls, Inc.*, 499 U.S. 187, 197–98, 111 S.Ct. 1196, 1202–03, 113 L.Ed.2d 158 (1991) (rejecting circuit court's decision that

---

3. As stated in the Court's November 1, 1996 Order at 7 n. 1, the Court's conclusions regarding the claims based on 42 U.S.C. §§ 3604(a) and 3604(f)(1) apply equally to the claims arising under the Washington Law Against Discrimination, RCW 49.60.222.

4. In its November 1, 1996 order, the Court held that residents of group homes for youth are encompassed by the FHA's definition of "familial status." Order at 8. The Court declines defendant's invitation to reconsider this decision.

5. Plaintiffs have also faulted the Ordinance for placing homes with residents "impaired by drug or alcohol dependency" into Class II. Plaintiffs assert that these types of individuals are handi-

capped under the FHA, thus providing another example of the Ordinance's facial invalidity. The Court rejects this argument as the FHA's definition of "handicap" explicitly excludes *current* substance abuse.

6. That the Ordinance may have a discriminatory impact does not preclude use of disparate treatment analysis. *See Bangerter*, 46 F.3d at 1501 ("We also do not suggest that the differential treatment in this case has not caused a 'disparate impact' on the handicapped in an everyday sense—as probably all intentional discriminatory treatment does. However, the legal framework for discriminatory effects, or disparate impact, claims remains inappropriate for this case.").

a policy which explicitly classified based on gender and childbearing capacity was facially neutral).[7]

The Court concludes that the classifications drawn by the terms of the Ordinance and the burdens it places on certain Bellevue residents renders it discriminatory on its face. The analysis in *Potomac Group Home Corp. v. Montgomery County*, 823 F.Supp. 1285 (D.Md.1993), is instructive. There the court found a neighborhood notification requirement unduly burdensome to members of a group home for the disabled. The defendant's offer to strike the language reflecting its discriminatory intent could not save the law. According to the court, "[s]uch a transparent attempt to achieve facial neutrality would merely hide the offensive purpose of the regulation and would not cure its illegality under the FHAA." *Id.* at 1297.

In *McWright v. Alexander*, 982 F.2d 222 (7th Cir.1992), the Seventh Circuit explains how language appearing neutral at first blush can nonetheless reflect discriminatory intent. In *McWright* the court pointed out that terms such as "gray hair" are proxies for old age; thus laws using such language can be facially invalid even without explicitly naming the elderly. *Id.* at 228; *see also Alliance for the Mentally Ill v. City of Naperville*, 923 F.Supp. 1057, 1071 (N.D.Ill. 1996) ("It is true that the RBCO provisions of the LSC apply to buildings that provide personal care services, rather than buildings that house handicapped persons. However,

this is a distinction without a difference, since individuals who need personal care services are typically handicapped.").[8]

■ Analyzing the language of Ordinance No. 4861 demonstrates its facial invalidity. The Ordinance's definition of "Family" very clearly may include group homes: "One or more persons (but not more than six unrelated persons) living together as a single housekeeping unit." The Ordinance also defines a "Group Facility": "A staffed living facility for a group of persons, which may include both children and adults...." The Ordinance thus distinguishes Group Facilities from Families in part based on the presence of "Staff," those who provide "care and supervision for and assistance with the daily living activities of the Residents in a Group Facility," and the Court finds that this use of "Staff" is a proxy for a classification based on the presence of individuals under eighteen and the handicapped as both groups require supervision and assistance. If a group home fits within the definitions of both "Family" and "Group Facility," the Ordinance specifies that the latter characterization controls, resulting in different treatment for groups, similarly situated in terms of the Ordinance's own definition of "Family," on account of their familial status or handicaps.

The distinction the Ordinance draws between Families and Group Facilities rises to a statutory violation because of the burdens placed on the latter but not on the former. All Group Facilities must be at least 1000

---

**7.** The United States, as amicus curiae, submits that the Court should also explore other evidence of discriminatory intent. To support this contention the United States cites *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). This precedent is distinguishable as the Supreme Court was assessing a discrimination claim under the Equal Protection Clause, not the FHA; furthermore, the validity of a facially *neutral* action was before the Supreme Court. In the Seventh Circuit's consideration of the FHA claims on remand, the court explicitly stated that "a showing of discriminatory intent is not required under section 3604(a)." 558 F.2d 1283, 1290 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978). The Court does not believe that circumstantial evidence of discriminatory intent is irrelevant but rather is properly considered in assessing a defendant's justifications for differential treatment.

**8.** That a law may not burden all members of the protected class does not remove its facially discriminatory character. *See Asbury v. Brougham*, 866 F.2d 1276, 1281–82 (10th Cir.1989) (holding that evidence of a high percentage of minority residents could not by itself dispose of an intentional discrimination claim); *Davis v. The Mansards*, 597 F.Supp. 334, 345 (N.D.Ind.1984). The flipside of this last point is also true: that an ordinance also discriminates against individuals unprotected by the FHA does not eliminate a FHA violation. *See, e.g., Potomac Group Home Corp. v. Montgomery County*, 823 F.Supp. 1285, 1296 n. 9 (D.Md.1993) ("The fact that the notice regulation 'may also incidentally catch in its net some group homes that serve individuals without handicaps does not vitiate the facial invalidity of the rule which clearly restricts the housing choices of people based on their handicaps.'").

feet from another Group Facility of the same type. Additionally, Group Facilities located in residential zones R–1 through R–7.5 are limited to six Residents, two resident staff, and minor children of the Residents and the staff; in contrast, any number of related individuals can reside together. Thus the Ordinance facially discriminates on the basis of familial status and handicap through its imposition of these requirements.

The facial discrimination does not end with the distinction between families and Group Facilities. The Ordinance also differentiates among Group Facilities depending on their placement in either Class I or Class II. Class I encompasses five specific types of Group Facilities; all others fall into Class II. Significantly, adult family homes with Resident Staff are included in Class I while family homes for youth with Resident Staff are not. This distinction clearly rests on the familial status of the residents.

▉▉▉▉ Class II homes have additional burdens not placed on those in Class I. Such facilities must obtain a permit and are unable to locate in *any* residential area if they accept short-term residents, if their license holder does not regard the facility as his or her primary residence, or if they accept non-handicapped residents who are a "danger to others." Group homes for youth, for example, usually fall into Class II; these homes generally are a mix of handicapped and non-handicapped residents, hire professional staff that do not hold the license for the home, and require the flexibility to have some residents stay for fewer than thirty days. Whittaker Decl., docket no. 34, ¶¶ 10, 11, 14. Thus

Ordinance No. 4861 places burdens on certain group homes but not others depending on the familial status of their residents, and these burdens will fall on handicapped individuals.[9]

## 2. Defendant's Rebuttal

Even though the language of the Ordinance singles out individuals for discriminatory treatment based on their familial status and handicap, a proper justification can legitimize the different treatment and validate the Ordinance. The FHA allows cities to place at least two restrictions on housing choices: those imposing reasonable occupancy limits,[10] and those limiting individuals "whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others."[11] Wisely, defendant has not chosen to focus its rebuttal on these statutory exemptions, as they are inapplicable for reasons discussed below. Rather, Bellevue urges the Court to allow the differential treatment based on Bellevue's general interests in public safety, stability, and tranquility.

The Ninth Circuit has not adopted a standard of review for determining the acceptability of these justifications and a split exists within the circuits. The Eighth Circuit employs the same standard for analyzing defendants' rationales in challenges under the FHA as it applies to claims under the Equal Protection Clause. *See Familystyle of St. Paul v. City of St. Paul*, 923 F.2d 91, 94 (1991). Because neither children nor the

---

9. Defendant has asserted that the Court is collaterally estopped from finding the Ordinance facially invalid in its treatment of the handicapped. Defendant bases this contention on an opinion authored by the Central Puget Sound Growth Management Hearings Board. The Court holds that it is not estopped from considering this issue. The final judgment of an administrative agency can only collaterally estop the Court if based on factual determinations. *Malland v. Department of Retirement Sys.*, 103 Wash.2d 484, 490, 694 P.2d 16 (1985). The Board specifically stated that it was reaching a legal conclusion in finding that the handicapped are not subjected to differential treatment. Thus the Board's decision does not bar the Court's consideration of this issue.

10. 42 U.S.C. § 3607(b)(1). In *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995), the Supreme Court declined to exempt from the FHA's scope a land use code's definition of "family" which contained an occupancy limitation, much like the one before this court. The Supreme Court found the section 3607(b)(1) exemption inapplicable to "rules designed to preserve the family character of a neighborhood, fastening on the composition of households rather than on the total number of occupants living quarters contain." *Id.* at ——, 115 S.Ct. at 1782.

11. 42 U.S.C. § 3604(f)(9).

handicapped are suspect classes under Equal Protection jurisprudence, a court following the Eighth Circuit's approach would only apply rational basis review to defendants' proffered justifications. *See Gutierrez–Tavares v. INS,* No. 94–70210, 1996 WL 426882 at *5 (9th Cir. July 30, 1996) (stating that children are not a suspect class); *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 446, 105 S.Ct. 3249, 3257, 87 L.Ed.2d 313 (1985) (stating that the handicapped are not a suspect class). Because the FHA makes both children and the handicapped protected classes, the Court rejects the Eighth Circuit's standard of review and adopts a more searching approach.

 The Court will instead follow the Sixth and Tenth Circuits' method of analysis. To rebut a finding of facial discrimination under this standard, the defendant must show either (1) that the ordinance benefits the protected class or (2) that it responds to legitimate safety concerns raised by the individuals affected, rather than being based on stereotypes. *See Larkin v. State of Michigan Dept. of Social Serv.,* 89 F.3d 285, 290 (6th Cir.1996); *Bangerter v. Orem City Corp.,* 46 F.3d 1491, 1503–04 (10th Cir.1995). This scrutiny requires an examination of the characteristics of the specific individuals impacted by the ordinance. *Bangerter,* 46 F.3d at 1503–04.

Defendant has argued that other justifications than these two are appropriate. In a footnote *Bangerter* did leave open the possibility that it might consider additional rationales. 46 F.3d at 1503 n. 19 ("Because of the preliminary record, we do not preclude the possibility that additional justifications for Orem's actions might be developed once evidence is taken."). Defendant cites this footnote and argues further for a different standard because both *Larkin* and *Bangerter* addressed only discrimination against the handicapped, not also discrimination based on familial status.

Defendant's argument is without merit. First, the procedural history of *Bangerter* provides essential context in which to consider footnote nineteen. The district court in *Bangerter* dismissed the plaintiff's claims pursuant to Fed.R.Civ.Pro. 12(b)(6), meaning

defendant had not yet put evidence into the record. The *Larkin* decision, which used the same two factors as the *Bangerter* court in affirming a summary judgment decision in plaintiff's favor, more closely resembles the situation at hand. *See* 89 F.3d at 290–92. The *Larkin* defendants had the burden of justifying the discrimination and thus had to proffer evidence that the restrictions placed on the handicapped were warranted by the characteristics of those affected. The court assessed the evidence defendants offered to support its rationales for the differential treatment, before affirming the trial court's finding of intentional discrimination based on the statute's language. *Id.; see also Alliance for the Mentally Ill v. City of Naperville,* 923 F.Supp. 1057, 1072–78 (N.D.Ill. 1996) (granting plaintiff's summary judgment motion because the defendant had not presented evidence that the actual and *prospective* residents of a group home needed the additional safety requirements imposed on them by an ordinance).

Second, the standard of review adopted by the *Larkin* and *Bangerter* courts is not so unique to the handicapped that it cannot be used in claims of discrimination based on familial status: any asserted benefits of the restrictions must outweigh the burdens, and restrictions cannot rely on stereotypes of children who reside in group homes.

Bellevue's justifications cannot satisfy the scrutiny established by *Larkin* and *Bangerter.* Generalized interests in public safety, stability, and tranquility have been enough to redeem ordinances that drew distinctions between groups when subjected to rational basis review. *See Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). But under the stricter level of scrutiny appropriate here, these interests are only sufficient if they are threatened by the individuals burdened by the Ordinance.

Bellevue asserts that its interests in stability and tranquility support limiting to commercial zones those Class II homes not operated by Resident Staff or those which accept short-term residents. According to Bellevue, the Group Facilities within Class II meeting these criteria have a commercial character and are disruptive, thus rendering these

homes inappropriate for residential neighborhoods. While these two justifications have been upheld under rational basis review, they cannot withstand the more rigorous scrutiny required by *Larkin*. At any rate, there is no evidence demonstrating that the presence of Resident Staff, as opposed to shift staff or staff who do not hold the license for the facility, distinguishes a commercial operation from a residential one. Furthermore, the Court cannot reconcile these supposed interests with the fact that the land use code allows bed and breakfast establishments, commercial enterprises with short-term occupants, in any residential neighborhood. Bellevue City Code 20.10.440.

As to the concern for public safety, that too must fail because the Court finds that defendant is operating under stereotyped notions about certain types of group home residents rather than specific concerns raised by individuals. For example, Bellevue's city attorney stated that the evidence of crime committed by individuals with a prior criminal history prompted Bellevue's concern for public safety. Andrews Decl., docket no. 52, ¶ 5; *cf.* Wheeler Decl., docket no. 51, ¶ 5. But Bellevue offers no evidence showing that residents of Class II facilities are more dangerous than if they lived with their relatives or than the residents of Class I facilities. Defendant's public safety rationale does not stand up under scrutiny and defendant cannot invoke the statutory exemption from the FHA found in 42 U.S.C. § 3604(f)(9) because it has not demonstrated how any specific individuals attempting to reside in a Class II facility constitute a "direct threat." *See Bangerter*, 46 F.3d at 1503.

■ Defendant contends that its dispersal requirement is intended to help residents of group homes rather than harm them. Page two of the preamble to the Ordinance professes an intention of ensuring "sufficient dispersion of Group Facility uses to allow persons with handicaps equal opportunity to enjoy the benefits of residence in single-family, multi-family, and other zoning districts," and at page nine of its response memorandum to plaintiffs' motion, docket no. 49, defendant cited an interest in "furthering the integration of such facilities into their neighborhoods and preventing the development of mini-institutional ghettos." Courts should be wary of justifications purporting to help members of the protected class; the court should assess whether the benefits of the requirement "clearly" outweigh the burdens. *See Bangerter*, 46 F.3d at 1504.

The *Larkin* court found that a Michigan statute imposing a distance requirement only on adult family homes was facially discriminatory. 89 F.3d at 290. The court rejected defendants' assertion that the distance requirement was meant to counteract the clustering of the handicapped. Such a rationale was not enough because defendants had presented no evidence that the group homes would cluster without the restriction or that the residents of the group home would not prefer to live near other group home residents. The court accepted the legitimacy of the defendants' interest in promoting deinstitutionalization, but could not find any evidence that the spacing requirement furthered this goal. *Id.* at 291.

Because Bellevue has *no* group homes for youth, concerns of clustering or the creation of an institutionalized setting cannot be supported by the evidence. Even if other types of group-care facilities would support these concerns, the Ordinance as written is overbroad due to its unjustifiable impact on group homes for youth. *Cf. Larkin*, 89 F.3d at 291–92. Furthermore, defendant has not pointed to any evidence demonstrating that those burdened by the restriction would benefit from it.

Finally, the Court finds invalid the occupancy limits triggered by the number of non-related individuals residing together. The limits are not a neutral, generally applicable limitation meant to protect the safety of the residents; rather they are part of the definition of "Family." Such use of occupancy limits is not within the exemption found at 42 U.S.C. § 3607(b)(1). *See City of Edmonds v. Oxford House, Inc.*, —— U.S. ——, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995). Through its definition of "Family" the Ordinance treats members of classes protected by the FHA differently from dwellings comprised solely of relatives. Defendant has proffered no evidence to justify treating homes with youth

and handicapped residents differently from dwellings comprised of individuals related by blood.

■ Contrary to defendant's repeated contentions, a willingness to make a reasonable accommodation cannot rebut a finding of facial discrimination. Rather, a government's unwillingness to make a reasonable accommodation is just one way to find that an ordinance discriminates on the basis of handicap. *See* 42 U.S.C. § 3604(f)(3). The statute talks about making accommodations in rules and policies "when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The Court concludes that the statute envisions situations where a facially neutral law unintentionally burdens a handicapped individual because the individual cannot comply with some of its requirements due to his or her handicap. As the *Bangerter* court stated, "the thrust of a reasonable accommodation claim is that a defendant must make an affirmative change in an otherwise valid law or policy." 46 F.3d at 1501–02; *see also Hovsons, Inc. v. Township of Brick,* 89 F.3d 1096, 1106 (3d Cir.1996) (" '[I]n requiring reasonable accommodation, . . . Congress surely did not mandate a blanket waiver of all *facially neutral* zoning policies and rules.' ") (quoting *Oxford House, Inc. v. City of Virginia Beach,* 825 F.Supp. 1251, 1261 (E.D.Va.1993)) (emphasis added).[12]

### 3. Circumstantial Evidence

■ Circumstantial evidence also supports a finding of intentional discrimination. First, the previous version of the Ordinance, No. 4696–A, specifically banned all youth homes from Bellevue's residential neighborhoods. Bellevue rewrote the Ordinance only after a state administrative body found it to be facially discriminatory. Second, defendant amended its comprehensive plan in 1996 to remove a provision calling for the "integration of special needs housing in the neighborhoods," and replacing it with one stating that "[h]ousing for people with special needs should be sited to protect residential neighborhoods from adverse impacts and avoid concentration of such housing." Third, the undisputed evidence is that Bellevue presently has *no* group homes for youth within its residential areas or elsewhere. Terry Decl., docket no. 56, ¶ 5; Smith Decl., docket no. 60, Exhib. A, at 3. Such evidence of discriminatory animus belies defendant's supposedly benign motives. *See Bangerter,* 46 F.3d at 1505 n. 23; *see also Epicenter of Steubenville, Inc. v. City of Steubenville,* 924 F.Supp. 845, 851 (S.D.Ohio 1996) (using circumstantial evidence of discriminatory intent to rebut defendant's proffered justifications for an ordinance the court held invalid on its face); *cf. Rogers v. Lodge,* 458 U.S. 613, 625, 102 S.Ct. 3272, 3279, 73 L.Ed.2d 1012 (1982) (affirming a district court's decision to look to evidence of past discrimination because "[e]vidence of historical discrimination is relevant to drawing an inference of purposeful discrimination, particularly in cases such as this one where the evidence shows that discriminatory practices were commonly utilized, that they were abandoned when enjoined by courts or made illegal by civil rights legislation, and that they were replaced by laws and practices which, though neutral on their face, serve to maintain the status quo"). Thus the circumstantial evidence supports the Court's finding of intentional discrimination.

### B. 42 U.S.C. § 3617

■ Plaintiffs further allege that the Ordinance's threat of civil and criminal sanctions violates the section of the FHA codified at 42 U.S.C. § 3617. This provision makes it a civil offense for individuals to intimidate others who are exercising the rights guaran-

---

12. The Court rejects the result reached in *Elderhaven, Inc. v. City of Lubbock,* 98 F.3d 175 (5th Cir.1996). There the Fifth Circuit found no violation of the FHA due to the city's professed willingness to make reasonable accommodations so that the extra burdens an ordinance placed on the handicapped would never actually be imposed. The court never distinguished the contrary approach taken by the Tenth Circuit in *Bangerter,* the approach accepted by this Court. For the reasons discussed in this Order, the Court refuses to find that defendant's claim that it will make reasonable accommodations rather than apply the Ordinance's discriminatory provisions can save it from violating the FHA. The opposite approach does not offer protection to members of the FHA's protected classes.

teed under the FHA. 42 U.S.C. § 3617. This Court will follow the lead of other courts in holding that plaintiffs' demonstration that the Ordinance violates section 3604 supports the same result under section 3617. *See, e.g., South–Suburban Housing Center v. Greater South Suburban Bd. of Realtors,* 935 F.2d 868, 886 (7th Cir.1991), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 971, 117 L.Ed.2d 136 (1992).

### *C. 42 U.S.C. § 3615*

█ Section 3615 of Title 42 gives courts the power to invalidate the laws of a state or any of its political subdivisions to the extent they are deemed a discriminatory housing practice under the FHA. Having found that Ordinance No. 4861 violates 42 U.S.C. §§ 3604(a), 3604(f)(1), and 3617, the Court declares the Ordinance invalid pursuant to 42 U.S.C. § 3615.[13]

### *III. Constitutional Challenges*

Plaintiffs also argue that the Ordinance conflicts with the Equal Protection and Due Process Clauses of the federal constitution. Because the Court has already found the Ordinance in violation of a statutory provision, it is unnecessary to rule on constitutional grounds as well. *See Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2996, 86 L.Ed.2d 664 (1985) (" 'Prior to reaching any constitutional questions, federal courts must first consider nonconstitutional grounds for decision.' ") (quoting *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99, 101 S.Ct. 2193, 2199, 68 L.Ed.2d 693 (1981)).

### *CONCLUSION*

The Court holds that Ordinance No. 4861 contains facially discriminatory language evidencing discriminatory intent unrebutted by defendant. The Ordinance violates both the FHA and the Washington Law Against Dis-

crimination, and the Court declares it invalid pursuant to 42 U.S.C. § 3615.

IT IS SO ORDERED.

---

**13.** Defendant asserts that the Ordinance's provisions are severable, and cites several cases where the courts found certain provisions of an ordinance facially neutral while finding others facially discriminatory. *See, e.g., Potomac Group Home Corp. v. Montgomery County,* 823 F.Supp. 1285 (D.Md.1993). What defendant fails to realize is that the discriminatory classification scheme infects the entire Ordinance; it is the classification of various living arrangements which triggers the requirements. Bellevue would not know whether a group home needs to obtain a permit, for example, if it did not first determine whether that group home falls into Class I or Class II. In contrast, the ordinance in *Potomac* used different classification schemes in different portions of the ordinance thus allowing the court to invalidate sections rather than the ordinance as a whole.