26 P.3d 955 (2001)
107 Wash.App. 109
SUNDERLAND FAMILY TREATMENT SERVICES, a Washington non-profit corporation, Respondent,
v.
CITY OF PASCO, a Washington municipal corporation, Appellant.
No. 18951-1-III.
Court of Appeals of Washington, Division 3, Panel Six.
July 3, 2001.
*957 Greg A. Rubstello, Ogden, Murphy, Wallace PLLC, Seattle, for Appellant.
Timothy G. Klashke, Pasco, for Respondent.
*956 KURTZ, C.J.
The City of Pasco denied Sunderland Family Treatment Services' application for a special use permit to operate a group care facility for handicapped youth in a residential area. Sunderland filed a Land-Use Petition Act (LUPA) petition. On appeal to the superior court, the court concluded that the City's denial of the special use permit constituted an erroneous interpretation of the law violating the Washington Housing Policy Act (WHPA), the Washington Law Against Discrimination, the Federal Fair Housing Amendments Act (FHA), the Americans with Disabilities Act, and the Rehabilitation Act of 1973. On appeal to this court, we address whether the City's regulatory scheme violated the WHPA. We conclude that it did and reverse the City's land use decision.

FACTS
Sunderland I. In March 1993, Sunderland Family Treatment Services applied to the City for a special use permit (SUP) to operate a youth crisis residential center in a Sunderland-owned residence located in an R-1 zoning district. This crisis residential center was to be operated under RCW 74.13.032. The City denied the application for the SUP, but the Franklin County Superior Court reversed, concluding that the City's denial constituted handicap discrimination under the WHPA, RCW 35A.63.240. Sunderland sought and received direct review by the Washington Supreme Court. While the appeal was pending, Sunderland, a nonprofit community mental health agency, lost funding for the crisis residential center. Sunderland Family Treatment Servs. v. City of Pasco, 127 Wash.2d 782, 787, 903 P.2d 986 (1995) (Sunderland I). Sunderland informed the court of the loss of funding and explained that funding from a different source had been obtained to operate the facility. Id.
In Sunderland I, the court considered whether the planned population of the Sunderland crisis residential centerabused and neglected childrenwere handicapped under the WHPA. Id. at 789, 903 P.2d 986. The court determined that the children to be served by the Sunderland facility were not handicapped and, consequently, the WHPA was inapplicable. Id. at 791-92, 798, 903 P.2d 986. However, the court also found that the City's denial appeared to rest on neighborhood opposition to the facility. Id. at 797, 903 P.2d 986. Hence, the court concluded that the denial of the SUP was not based on competent and substantial evidence. Id. Because of the loss in funding and the failure of either Sunderland or the City to create a sufficient record, the court remanded the matter to the City for further proceedings. Id. at 798, 903 P.2d 986.
Amended SUP Application. On remand, Sunderland amended its SUP application, explaining that the application was essentially the same as the initial application but that the proposed facility would now be used to house youths ages 12-17 with a diagnosed mental impairment. These children would be referred through mental health professionals and would have a diagnosed mental illness requiring a group setting with 24-hour professional staff supervision as part of a proscribed treatment plan.
*958 The proposed group home would operate under state licensing standards to serve the residential needs of seriously and severely disturbed minor children. The children would be prescreened and preassessed for placement in the home by a mental health professional pursuant to the provisions and criteria contained in chapter 71.24 RCW, chapter 71.34 RCW, WAC 275-57, and WAC 388-73. Children who posed a danger to themselves or others would not be eligible for admission to the facility; neither would children actively using drugs or alcohol, or children with pending criminal charges.
Under the applicable state regulations, the proposed home would be required to maintain a one-to-four ratio of staff to children, and a staff person with a bachelor degree would be required to be on site at all times. As a result, the proposed home would operate with at least three staff people on duty. Testimony indicated that there would usually be two staff people coming and going every eight hours.
The primary use of the house would be residential, as the children would be transported off site to school, counseling, and treatment. Children residing in the home would most likely stay for a period of six to nine months. While in the home, the children would live in a very structured environment and would not be permitted to have friends visit. The proposed home would have to meet higher supervision requirements than those imposed on a foster family home. The type of service offered by the proposed home is not currently available in either Franklin or Benton Counties other than as part of an inpatient stay at Carondelet Psychiatric Care Facility.
The location of the proposed group home is property located within an R-1 single-family, low density residential zoning district designated in the Pasco Municipal Code (PMC) as the City's "Low Density Residential District." The property is developed with a residential structure that is currently vacant. The proposed group home would not require any physical alterations to its exterior and would appear physically indistinguishable from other single-family homes in the area. The properties surrounding the site are similarly zoned R-1. There are single-family residential dwellings to the east, south and north of the proposed group home. The Joyce Apartments are located directly to the west.
After holding a public hearing, the Pasco Planning Commission recommended approval of the SUP with 14 conditions. Despite this recommendation, the city council held a second hearing and issued a decision denying approval. At both proceedings, Sunderland contended that the City had no authority to require the SUP proceeding. Nonetheless, the City apparently took the position that a SUP proceeding was required because the proposed group home was either a "group care facility" or a "community service facility" as defined by PMC 22.12.385 and PMC 22.12.215. Significantly, the City's determination that Sunderland must apply for a SUP prevented Sunderland from taking immediate occupancy of the home and operating the home as a group care facility.
When evaluating Sunderland's application for a SUP, the City applied the home occupation ordinance that was designed to determine whether "the conduct of business may be permitted as a use accessory to an established residence." PMC 22.35.010. In denying Sunderland's application for a SUP, the City applied the environmental standards contained in PMC 22.35.050, which require that all home occupations be:
(1) clearly subordinate to the principal use of the property for residential purposes; (2) conducted by persons residing within the dwelling unit upon the premises; and (3) an occupation that does not require the customer or client to be present upon the premises while the profession, trade, skill or services are performed. The City based its denial of the SUP on the conclusions that (1) the nature and intensity of the use was not subordinate to the principal permitted use of the property, and (2) the proposed use was not in harmony with the existing residential development in the neighborhood.
Sunderland appealed to the superior court by filing a LUPA petition. Sunderland alleged the children who would reside in the home were legally "handicapped" and that the WHPA and/or the FHA prevented the *959 City from denying Sunderland's right to operate the proposed home. Additionally, Sunderland reserved the right to subsequently file and pursue claims for monetary damages against the City in an independent action for damages pursuant to the FHA, 42 U.S.C. § 3601, the Washington Law Against Discrimination (chapter 49.60 RCW), and 42 U.S.C. § 1983.
The superior court concluded the City's denial of the SUP constituted an erroneous interpretation of law violating the anti-handicap discrimination provisions in the WHPA, the FHA, the Washington Law Against Discrimination, the Americans With Disabilities Act, and the Rehabilitation Act of 1973. The superior court also concluded that the City's land use decision (1) was not supported by factual evidence that was substantial when viewed in light of the whole record before the court; (2) was clearly an erroneous application of the law to the facts; (3) was not supported by sufficient factual evidence; and (4) violated constitutional rights, and was arbitrary and capricious in that it constituted willful and unreasonable action taken in disregard of the relevant facts and circumstances. The court further concluded that the denial of the SUP constituted a clearly erroneous application of the law to the facts.
Accordingly, the superior court reversed the City's land use decision and found that "as a matter of law, Sunderland is and shall be entitled to immediately occupy and operate the proposed Home at the proposed location as a matter of right and without the need or requirement of a SUP or any other authorization or approval of or by the City." Clerk's Papers at 40.
The City appeals contending its decision to deny Sunderland's application for a SUP was not erroneous and was supported by sufficient evidence. The City also contends the superior court erred by failing to grant the City's motions to dismiss under CR 41(b) and CR 41(b)(1).
Motion to Dismiss. The City first contends the trial court erred by failing to grant its motion to dismiss under CR 41(b) or CR 41(b)(1). This court cannot review the denial of the CR 41(b) motion because the City has failed to provide a report of proceedings of the court's hearing on the CR 41(b) motion. Without a record of proceedings, this court would have to speculate as to the reasoning behind the court's decision to deny the motion. As the appellant, the City has the burden of providing a record sufficient to review the issues raised. State v. Garcia, 45 Wash.App. 132, 140, 724 P.2d 412 (1986). Moreover, dismissal was not required under CR 41(b)(1) because the matter was noted for the final hearing before the hearing on the motion to dismiss.

ANALYSIS OF LUPA APPEAL
Scope and Standard of Review. With limited exceptions, LUPA provides "the exclusive means of judicial review of land use decisions." RCW 36.70C.030(1). By petitioning under LUPA, a party seeks judicial review by asking the superior court to exercise appellate jurisdiction. Chaney v. Fetterly, 100 Wash.App. 140, 142 n. 2, 995 P.2d 1284, review denied, 11 P.3d 824 (2000). The court may affirm or reverse the land use decision under review or remand the decision for modification or for further proceedings. RCW 36.70C.140. This court stands in the same position as the superior court when reviewing the underlying administrative decision. Biermann v. City of Spokane, 90 Wash. App. 816, 821, 960 P.2d 434 (1998), review denied, 137 Wash.2d 1004, 972 P.2d 466 (1999). Under LUPA, a reviewing court may grant relief under any or all of the six circumstances set forth in RCW 36.70C.130(1). Issues of law are reviewed de novo. City of University Place v. McGuire, 102 Wash.App. 658, 667, 9 P.3d 918 (2000); Girton v. City of Seattle, 97 Wash.App. 360, 363, 983 P.2d 1135 (1999), review denied, 140 Wash.2d 1007, 999 P.2d 1259 (2000).
LUPA Petition. Sunderland's LUPA petition seeks reversal of the City's land use decision to deny approval of a SUP for Sunderland's proposed home. Sunderland's petition alleges the City's land use decision: (1) constituted an erroneous interpretation and application of the WHPA and the FHA; and (2) was not supported by evidence that was substantial when viewed in light of the whole record. Claims for damages or compensation *960 may be set forth in the same complaint with a land use petition and the judge who hears the land use petition may, if appropriate, preside at a trial for damages or compensation. RCW 36.70C.030(1)(c). However, in its petition, Sunderland reserved the right to subsequently file and pursue claims for monetary damages against the City in an independent action for damages pursuant to the FHA, 42 U.S.C. § 3601, the Washington Law Against Discrimination (chapter 49.60 RCW), and 42 U.S.C. § 1983.
The superior court reversed the City's land use decision but treated the LUPA proceeding as a summary judgment proceeding addressing liability issues under the WHPA, the Washington Law Against Discrimination, the FHA, the Americans With Disabilities Act, the Rehabilitation Act of 1973, and 42 U.S.C. § 1983. Because we are exercising appellate jurisdiction, we limit our review to those issues raised by Sunderland in its LUPA petition. We first consider the applicability of the WHPA and the FHA.
WHPA v. FHA. The Legislature adopted the WHPA to, among other things, "[i]ncrease the supply of housing for persons with special needs." RCW 43.185B.005(2)(e). The WHPA, in pertinent part, reads as follows:
No city may enact or maintain an ordinance, development regulation, zoning regulation or official control, policy, or administrative practice which treats a residential structure occupied by persons with handicaps differently than a similar residential structure occupied by a family or other unrelated individuals. As used in this section, "handicaps" are as defined in the federal fair housing amendments act of 1988 (42 U.S.C. § 3602).
RCW 35A.63.240 (emphasis added). The WHPA is a broad provision tailored to address municipal ordinances, practices, or policies that treat similar residential structures "differently" based on the residents' handicap and familial status. Significantly, the WHPA does not contain an intent requirement or require a showing of "discrimination." In other words, the WHPA prohibits ordinances, practices, or policies that distinguish between residential structures based on the residents' handicaps and familial status, regardless of a city's intent when enacting or enforcing the ordinance, policy or practice.
The trial court suggests that the WHPA and the FHA are coextensive. We disagree. A violation of the FHA, 42 U.S.C. § 3604(f), may be established under any or all of three theories: disparate treatment, disparate impact, and failure to make reasonable accommodations. Smith & Lee Assocs. v. City of Taylor, 102 F.3d 781, 790 (6th Cir.1996). The disparate treatment theory applies when an ordinance is facially discriminatory and the disparate impact theory applies when an ordinance is neutral on its face, but has a disparate impact. Children's Alliance v. City of Bellevue, 950 F.Supp. 1491, 1495 (W.D.Wash.1997); Bryant Woods Inn, Inc. v. Howard County, 911 F.Supp. 918, 938 (D.Md.1996), aff'd, 124 F.3d 597 (4th Cir.1997). The disparate treatment theory requires a showing of discriminatory intent and the disparate impact theory requires a showing of a discriminatory effect.[1] Significantly, the FHA also defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" 42 U.S.C.A. § 3604(f)(3)(B) (West 1994). Consequently, when applying a valid ordinance, a government's failure to make a reasonable accommodation for people with disabilities may give rise to a cause of action under the reasonable accommodations theory. Bryant Woods, 911 F.Supp. at 928.
*961 We conclude that reference to the FHA is helpful when applying the WHPA but we do not believe these provisions are coextensive because the FHA prohibits discriminatory housing practices based on handicap or familial status whereas the WHPA has no intent requirement and requires only a showing that an ordinance, practice, or policy treats residential structures occupied by handicapped persons "differently" than a structure occupied by a family or other unrelated individuals. Furthermore, the WHPA does not contain language that would require a city to make reasonable accommodations to permit a person with a handicap to occupy a dwelling.
Sunderland encountered two separate obstacles when it attempted to open a group home for handicapped children in Pasco. First, the City ordinances required Sunderland to obtain a SUP before occupying the selected residential structure. Second, the City denied the SUP based on the requirements contained in the City's home occupation ordinance. Sunderland contends the ordinances triggering these events violated the WHPA and the FHA. Because we have only the administrative record before us, we limit our inquiry to the application of the WHPA and the question of whether the application of the City's ordinances caused the proposed Sunderland home to be treated differently than a similar residential structure occupied by a family.[2]
SUP Requirement. Sunderland was required to obtain a SUP because it did not fit within the definition of "family" contained in PMC 22.12.330, which defines "family" as "one or more related persons, or five or less unrelated persons over the age of sixteen years occupying premises and living as a single housekeeping unit as distinguished from a group home, group care facility, lodging house, boarding home, club, fraternity or hotel." (Emphasis added.)
The City apparently took the position that a SUP proceeding was required because the proposed group home was either a "group care facility" or a "community service facility" as defined by PMC 22.12.385 and .215. A group care facility or a community service facility is an unclassified use that is permissible in any zoning district under a SUP. PMC 22.80.010; .020(3), (7). However, a "family," irrespective of size, or a chapter 74.15 RCW foster family home may occupy a residential structure in the same neighborhood without having to obtain a SUP.
As a residential facility, the proposed group home is best categorized as a "group care facility," rather than a "community service facility." A "community service facility" includes daycare centers, nursery schools, churches and other providers of social, health, and welfare services. PMC 22.12.215. A "group care facility" is defined as "any number of unrelated persons living together as a single housekeeping unit sponsored by a public or private service entity whether supervision of the residents is provided on a full or part-time basis." PMC 22.12.385.
It follows then that the proposed home could be categorized as a "family" unless the home consisted of six or more 17 year olds. But the proposed Sunderland home was not treated as a "family" because the proposed home fell within the definition of a "group care facility" based on the supervision needs of the proposed residents. Hence, Sunderland was required to obtain a SUP for the proposed home because the residents were unrelated and required "supervision."
Our analysis under the WHPA is guided by City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995) and Children's Alliance v. City of Bellevue, 950 F.Supp. 1491 (W.D.Wash.1997), two cases that consider the application of the FHA to city ordinances. In Edmonds, the Supreme Court considered whether an ordinance that defined "family" based on an occupancy limitation qualified under a FHA provision that exempted "`any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling.'" Edmonds, 514 U.S. at 728, 115 S.Ct. 1776 (quoting 42 U.S.C. § 3607(b)(1)). The court held that this provision exempts only total occupancy limits that *962 are intended to prevent overcrowding, and not ordinances that are designed to promote the "family character" of a neighborhood. Edmonds, 514 U.S. at 735, 115 S.Ct. 1776. The ordinance in question governed single-family dwelling units and defined "family" to include any number of persons related by genetics, adoption, or marriage, or a group of five or fewer unrelated persons. Id. at 728, 115 S.Ct. 1776. The Supreme Court concluded the FHA applied to "rules designed to preserve the family character of a neighborhood, fastening on the composition of households rather than on the total number of occupants living quarters can contain...." Id. at 735, 115 S.Ct. 1776.
In Children's Alliance, the court considered the language of Bellevue Ordinance No. 4861. As here, the definition of "family" in Ordinance 4861 could have included a group home. Ordinance 4861 defined a "family" as "[o]ne or more persons (but not more than six unrelated persons) living together as a single housekeeping unit." The ordinance went on to define a "group facility" as a "`staffed living facility for a group of persons, which may include both children and adults....'" Children's Alliance, 950 F.Supp. at 1496. The court determined that the language of Ordinance 4861 was facially invalid because the ordinance distinguished between group facilities and families based on the presence of "staff" who provide "`care and supervision for and assistance with the daily living activities of the Residence in a Group Facility.'" Id. The court concluded that the use of "staff" was a proxy for a classification based on the presence of individuals under 18 and individuals with handicaps as both groups require supervision and assistance. Id.
The Children's Alliance court further concluded that the distinction drawn between families and groups constituted a FHA violation because of the burdens placed on the latter but not on the former. Each group facility was required to be at least 1,000 feet from another group facility of the same type; group facilities located in residential zones R-1 through R-7.5 were limited to six residents, two resident staff, and minor children of the residents and the staff even though any number of related individuals could reside together. Id. at 1497.
Applying the reasoning of Edmonds and Children's Alliance, in the context of the WHPA, we conclude that the City violated the WHPA by defining "family" in such a way as to impose additional burdens on residential care facilities for the handicapped. The City violated the WHPA by adopting a regulatory scheme that permitted a "family" to obtain immediate occupancy of a residential structure but required "group care facilities" to obtain a SUP before occupying a similar residential structure. But for the City's definition of family, the residents of the proposed facility would have been entitled to immediate occupancy of the home. Instead, the residents of the proposed facility were denied access based on their handicap and familial status.
The City contends the SUP requirement does not treat persons with handicaps differently. The City argues that the handicapped children were not completely excluded from the neighborhood in that they could live in the neighborhood as part of a foster family home.
In making this argument, the City ignores the fact that the WHPA targets ordinances, practices, and policies that distinguish between residents of similar residential structures based on handicap and familial status. The ordinances here would permit a handicapped child to live in a foster family home in the same neighborhood, but this child would not receive the level of supervision available in the Sunderland home unless the foster parents had the same certification and employed the same supervision techniques required by the regulations governing the proposed Sunderland home. By limiting these children to the type of care provided in a foster home, the City prevented these children from residing in a setting tailored to meet their special needs solely because of their familial status. In short, the City's arguments concerning foster homes address issues related to handicap discrimination, but not discrimination based on the presence of a handicap and familial status.
The City next argues that a SUP was required because the proposed home is different *963 than a foster family home in that the Sunderland home requires paid staff and an increased intensity of use in terms of the level of supervision within the home. In other words, the City argues that its treatment of foster family homes demonstrates that similar families are treated the same and that the proposed Sunderland facility is treated differently because the supervision within the facility is not similar to that required in a typical family or foster home. In short, the City suggests that the WHPA is inapplicable in the absence of a showing that the handicapped person will live in a residential social setting similar to that found in a family.
This argument is without merit. The WHPA prohibits a city from treating "a residential structure occupied by persons with handicaps differently than a similar residential structure occupied by a family or other unrelated individuals." RCW 35A.63.240 (emphasis added). Contrary to the position advocated by the City, the WHPA requires that only the residential structures must be "similar," not that the living arrangements and supervision must be similar to that in a "family." Nothing in the WHPA authorizes cities or courts to examine the level of supervision within a residential structure in order to determine that the handicapped persons will be living in a setting similar to a "family."
The City also contends the SUP proceeding was proper because the home occupation ordinance is applied equally to families and group facilities. In making this argument, the City attempts to justify its definition of "family" with considerations of intensity of use drawn from its home occupation ordinance. The City's definition of "family" must be evaluated separately. Here, the City's definition of "family" treats similar residential structures differently based on the potential residents' familial status and need for supervision.
Lastly, the City argues that the SUP requirement was proper under the WHPA because a SUP requirement would be permitted under the FHA. To this end, the City cites cases resolved under the FHA reasonable accommodation theory. See Smith & Lee Assocs. v. City of Taylor, 102 F.3d 781 (6th Cir.1996); Hovsons, Inc. v. Township of Brick, 89 F.3d 1096 (3rd Cir.1996); Oxford House-C v. City of St. Louis, 77 F.3d 249 (8th Cir.1996); United States v. Village of Palatine, 37 F.3d 1230 (7th Cir.1994). But the WHPA does not encompass the reasonable accommodation analysis. The City also relies on a FHA case applying the disparate treatment analysis, Keys Youth Services, Inc. v. City of Olathe, 52 F.Supp.2d 1284, 1301 n. 18 (D.Kansas 1999), aff'd in part, rev'd in part, 248 F.3d 1267 (10th Cir. 2001), where the court concluded that an aggrieved party could not claim that the City of Olathe intentionally discriminated against potential residents by requiring them to go through a permit process. But, the WHPA does not require a showing of intentional discrimination.
In conclusion, the proposed Sunderland home was treated differently than a family because the supervision needs and familial status of the potential residents triggered the SUP requirement. Consequently, the applicable ordinances, including the definition of "family," violated the WHPA as set forth in RCW 35A.63.240.
Home Occupation Ordinance. We next consider the City's application of the home occupation ordinance. PMC 22.35.010 states the purpose of the home occupation chapter as follows: "A home occupation chapter is established to provide a means whereby the conduct of business may be permitted as a use accessory to an established residence within a residential district." (Emphasis added.) Sunderland has established that the home will be used for only residential purposes and that all other services will be performed offsite. As a result, Sunderland does not seek approval for a "use accessory" to residential use.
Sunderland's use of the property also does not fall within the general definition of "home occupation" found in PMC 22.35.020, which provides, in part: "`Home occupation' means a profession, trade, skill or service possessed and utilized, in whole or in part, by a family member(s) for monetary gain within or upon the premises of a permanent dwelling unit in a residential district." (Emphasis added.) *964 The supervision performed at the Sunderland home will generally not be performed by "family" members. Nevertheless, the City applied the home occupation ordinance because PMC 22.35.020 also provides that the "home occupation" definition does not apply to conditional or unclassified uses that require a special use permit.
The City argues its application of the home occupation ordinance grants preferential treatment to group care facilities by permitting group care facilities to operate home occupations in circumstances where a family would not be permitted to do so. But this "preferential treatment" allows the City to exclude any group care facilities from a residential neighborhood because the home occupation ordinances are applied differently to families than to group care facilities. When applied to a "family," the home occupation ordinance evaluates accessory uses in addition to the dwelling's primary use as a residence. When applied to the Sunderland home, the home occupation ordinance permitted the City to deny residential use based on standards developed to evaluate an accessory use. In short, the City's "preferential treatment" permitted the City to apply the home ordinance standards to residential care facilities that would not otherwise fall within the definition of "home occupation."
The City denied the SUP based on PMC 22.35.050, which sets forth the environmental standards for home occupations. This provision reads as follows:
22.35.050 ENVIRONMENTAL STANDARDS. All home occupations shall conform to the following standards:
(a) Be clearly subordinate to the principal use of the property for residential purposes;

(b) Not involve modification of the property or exterior of its structures that indicates other than residential uses of the premises;
(c) Is performed entirely within a permanent structure upon the premises;
(d) No signs, display or other advertisement upon the property;
(e) No media or other off-premises advertising shall give the address or location of the home occupation;
(f) No outside storage of materials, supplies, products or by-products, or equipment, except a single occupational vehicle not exceeding 10,000 pounds Gross Vehicle Weight (GVW);
(g) Be conducted solely by persons residing within the dwelling unit upon the premises, subject to the definition of family;

(h) Except for articles produced thereon, no merchandise, products, goods or wares may be displayed or offered for sale upon the premises;
(i) No occupation requiring the customer or client to be present upon the premises while the profession, trade, skill or service is performed shall be allowed;

(j) Noise generated by the home occupation, detectable at any property line, shall not be in excess of the following standards:
(1) 8:00 a.m. to 8:00 p.m.: 55 dba,
(2) 8:00 p.m. to 8:00 a.m.: 45 dba;
(Emphasis added.)
In its decision denying the SUP, the City applied PMC 22.35.050(a), (g), and (i). These environmental standards rely on the concept of accessory use and the definition of family. Effectively, a "family" was the only entity that could meet these standards.
First, the environmental standards require that the home occupation be subordinate to the principal use of the property for dwelling purposes. PMC 22.35.050(a). Here, the "business" is necessary to permit residential usenot an accessory useof the property by handicapped children. Second, the environmental standards require that the business must be conducted by persons residing in the residence, "subject to the definition of family." PMC 22.35.050(g). This standard disallows the presence of any residential or nonresidential staff, denying specialized supervision and care unless it can be performed by a family member. Third, the environmental standards require that the home occupation be one that does not require the customer or client to be on the premises. PMC *965 22.35.050(i). Here, the "clients" are residents, not visitors.
A reading of the City's decision denying the permit demonstrates the difficulty of applying these provisions to the "family" composed of potential Sunderland residents. Although the City made a finding related to increased traffic intensity, the City also found that the proposed home would require greater professional supervision, and that "[n]o other residential structure in the neighborhood can have a licensed business on premises with non-resident employees and clientele that do not reside at the structure independent of the home business activity." Administrative Record: Findings, Conclusions and Decision for Denial of Special Use Permit, at tab 18, p. 3. Consequently, the City based its denial of the SUP on the conclusions that (1) the nature and intensity of the use was not subordinate to the principal permitted use of the property, and (2) that the proposed use was not in harmony with the existing residential development in the neighborhood.
In effect, the City exempted Sunderland from the definition of "home occupation," in order to apply the home occupation standards. When applying the standards, however, the City complained that the nature and intensity of the use was different precisely because the facility required "professional staff, rotating nonresident shift employees, volunteers and other professionals providing services" and none of the neighboring residential structures would be able to operate a home business with nonprofessional staff and clientele. Administrative Record: Findings, Conclusions and Decision for Denial of Special Use Permit, at tab 18, p. 5. Simply stated, the City denied the SUP because the proposed Sunderland home would not be occupied by a "family" and because the proposed home needed to employ paid staff in order for handicapped children to live there.
Because of the City of Pasco's definitions of "family" and "home occupation," and the application of the home occupation environmental standards, handicapped children who required specialized care were denied access to a single-family home in Pasco based on their handicap and their familial status. In short, handicapped children who required specialized care offered by the proposed Sunderland home were denied access to such care because the care was not offered in a setting that fit within the City's definition of "family." In effect, the Pasco regulatory scheme is even more restrictive than the scheme challenged in Children's Alliance. While the Children's Alliance scheme imposed restrictions on group homes, the Pasco scheme operated to prevent handicapped children from receiving the residential care and supervision they require under any circumstances.
Our scope of review is limited; we review the administrative record to determine whether the City's land use decision here should be affirmed, reversed, or remanded. We reverse the City's land use decision because it violates the WHPA. Sunderland is entitled to immediately occupy and operate the proposed home at the location for which it made application. In view of our disposition, we need not consider the other issues raised on appeal.
WE CONCUR: SCHULTHEIS, J., and SWEENEY, J.
NOTES
[1] "`The ultimate question in a disparate treatment case is whether the defendant intentionally discriminated against plaintiff.'" Bangerter v. Orem City Corp., 46 F.3d 1491, 1502 (10th Cir. 1995) (quoting Honce v. Vigil, 1 F.3d 1085, 1088 (10th Cir.1993)). The disparate impact analysis examines a facially-neutral policy or practice for its differential effect on a particular group. Id. at 1501 (citing Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 934-39 (2nd Cir.), aff'd in part, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988)). Several courts have concluded that a discriminatory impact cannot be established based on one isolated claim. Bryant Woods, 911 F.Supp. at 939.
[2] Because the issues here revolve around the definition and use of the term "family," our discussion is limited to the portion of the WHPA that addresses disparate treatment caused by handicapped and familial status.