Debra L. McWRIGHT, Plaintiff-Appellant,

v.

Lamar ALEXANDER, Secretary of the United States Department of Education, and United States Department of Education, Defendants–Appellees.

No. 91–3389.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1992.

Decided Dec. 28, 1992.

Holly A. Harrison (argued), Henry L. Mason, Sidley & Austin, Chicago, IL, for plaintiff-appellant.

Fred Foreman, U.S. Atty., Crim. Div., Chicago, IL, Carole Jeandheur, Ann M. Gulyassy, Robert V. Zener, Nancy E. Friedman (argued), Dept. of Justice, Civ. Div., Appellate Section, Washington, DC, for defendants-appellees.

Before CUDAHY, POSNER and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Debra L. McWright, who is unable to bear children, alleges that her employer, the Office of Civil Rights of the United States Department of Education (DOE), discriminated against her on the basis of handicap by refusing to grant her requests for childcare leave on terms comparable to

those given to biological mothers. The district court dismissed McWright's complaint brought under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, for failure to state a claim. We reverse and remand.

## I.

The facts, as alleged by the complaint, are as follows. McWright contracted polio at the age of one and a half years, leaving her with permanent physical handicaps. Among these handicaps is the inability to bear children. In February 1977, the DOE hired McWright as an equal opportunity specialist in the post-secondary education division of its Office of Civil Rights. McWright was hired as a handicapped individual pursuant to 29 U.S.C. § 501.

In July 1982, McWright informed her immediate supervisor, Branch Chief Catherine Martin, that she and her husband had decided to adopt a child and were pursuing the adoption process. McWright advised Martin that if she were able to adopt a child, she would be requesting extended leave to care for the child. In September 1982, McWright informed Martin and Martin's supervisor, Mary Francis O'Shea, that she and her husband had been accepted as adoptive parents and that she would be requesting extended child-care leave as soon as a child was placed.

In November 1982, McWright filed applications for childcare leave consisting of a combination of annual leave and leave without pay. Because McWright could not predict precisely when placement of a child would occur, she did not specify particular dates in her leave applications. On December 17, 1982, Martin met with McWright and advised her that she could take her requested leave only in one of three ways: first, she could take her leave immediately; second, she could specify a specific date in the future and take her leave at that time; or third, she could agree to complete all her pending work assignments before taking her leave. When presenting these options, Martin was fully aware that a child had not yet been placed with McWright.

McWright had no realistic choice but to accede to the third condition and agree to complete all her pending work assignments before taking her leave. The very next day, however, on December 18, 1982, Martin significantly increased McWright's caseload by assigning her three new cases. At the time, Martin knew that completion of these cases could take as long as a year or more.

Less than three weeks later, on January 5, 1983, McWright learned that a child would be available for placement. She immediately resubmitted her leave request, asking for annual leave from January 11 to February 7, 1983, and leave without pay from February 8 to May 17, 1983. The DOE denied her leave requests the next day, asserting that, because she had previously refused to specify particular dates for her leave, McWright would be required to complete her current caseload before taking leave.

When a son was placed with McWright on January 11, 1983, the DOE did give her four days of leave to bring the infant home and arrange for child care. After January 15, however, the DOE required McWright to return to work on a full-time basis, including a full week of travel to Ohio during the last week of January.

In February 1983, McWright again renewed her leave request, asking for annual leave from February 8 through March 8 and leave without pay from March 10 through June 29. This time, the DOE initially purported to approve her request unconditionally. In fact, however, the leave was granted on the condition that McWright work at home while on leave. McWright began her annual leave on February 3 and worked out of her home without compensation. On March 10, however (the day her leave without pay was to begin), McWright was informed by Martin that she would have to return to work full-time until all her pending assignments were completed.

On March 17, 1983, McWright informed her supervisors that she could no longer work under the conditions the office had imposed. She stated that unless her leave was reinstated, she would have no choice

but to resign. The DOE again denied McWright's leave request, and McWright tendered her resignation.

McWright alleges that she was treated differently from similarly situated non-handicapped DOE employees—i.e., biological mothers requesting extended leave for child care. The DOE consistently granted such requests made by biological mothers. In addition, it did not condition child-care leave for biological mothers upon the completion of pending work assignments, nor did it require biological mothers to work at home without compensation or to return to work before the expiration of their leave.

After exhausting her administrative remedies, McWright brought suit in the district court under the Rehabilitation Act. She alleged that the DOE had discriminated against her on the basis of her handicap and had failed to make a reasonable accommodation of her handicap. The DOE moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The district court granted the DOE's motion to dismiss, concluding that the "causal nexus between the alleged discrimination suffered by McWright and her inability to bear a child is too attenuated to meet the requirements of the Rehabilitation Act." *McWright v. Alexander*, 771 F.Supp. 256, 259 (N.D.Ill.1991). McWright appeals.

## II.

We review a decision granting a motion to dismiss *de novo*, assuming the truth of all well-pleaded factual allegations and drawing inferences in favor of the plaintiff. *Wroblewski v. City of Washburn*, 965 F.2d 452, 453 (7th Cir.1992). Dismissal under Federal Rule 12(b)(6) is appropriate only if relief could not be granted "under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

Section 501 of the Rehabilitation Act, 29 U.S.C. § 791, imposes an affirmative duty upon federal agencies "to structure their procedures and programs so as to ensure that handicapped individuals are afforded equal opportunity in both job assignment and promotion." *Prewitt v. United States Postal Serv.*, 662 F.2d 292, 306 (5th Cir. 1981) (quoting *Ryan v. Federal Deposit Ins. Corp.*, 565 F.2d 762, 763 (D.C.Cir. 1977)). Section 504 of the Act, 29 U.S.C. § 794, prohibits discrimination against individuals with handicaps by reason of their handicap "under any program or activity conducted by any Executive agency or by the United States Postal Service." Congress has expressly established private rights of action under both sections. 29 U.S.C. § 794a(a).

McWright's complaint raises two claims: one is denominated "Failure to Accommodate" and the other "Disparate Treatment." Although the complaint does not specify the section of the Act under which each claim is brought, on appeal McWright refers to her accommodation claim as a § 501 claim and her disparate treatment claim as a § 504 claim. The distinction may be relevant, for we have expressed doubts about whether § 504 applies to employment discrimination suits against federal agencies, *McGuinness v. United States Postal Serv.*, 744 F.2d 1318, 1321–22 (7th Cir.1984), and the issue has divided the circuits. *Compare Johnson v. United States Postal Serv.*, 861 F.2d 1475, 1477 (10th Cir.1988), *cert. denied*, 493 U.S. 811, 110 S.Ct. 54, 107 L.Ed.2d 23 (1989); *Boyd v. United States Postal Serv.*, 752 F.2d 410, 413 (9th Cir.1985) (§ 501 is exclusive remedy for federal employees) *with Smith v. United States Postal Serv.*, 742 F.2d 257, 260 (6th Cir.1984); *Treadwell v. Alexander*, 707 F.2d 473, 475 (11th Cir.1983); *Prewitt*, 662 F.2d at 302–04 (federal employees can sue under § 504). *See also Ristoff v. United States*, 839 F.2d 1242, 1243–44 (7th Cir.1988) (assuming without discussion that plaintiff may sue federal employer under § 504).

We need not resolve the question here. The complaint does not distinguish between § 501 and § 504, and we may treat both of McWright's claims as having been brought under § 501. In addition to requiring accommodation of individuals with handicaps, § 501—by regulation and interpretation—prohibits discrimination on

the basis of handicap, just like § 504. 29 C.F.R. § 1613.703 ("An agency shall not discriminate against a qualified physically or mentally handicapped person."); *Gardner v. Morris*, 752 F.2d 1271, 1277–78 (8th Cir.1985); *Shirey v. Devine*, 670 F.2d 1188, 1200–01 (D.C.Cir.1982). The duty placed on federal agencies by § 501 is at least as stringent as that imposed by § 504, and we assume that the same antidiscrimination principles apply.[1] *Gardner*, 752 F.2d at 1277–78.

Has McWright pleaded two claims or only one? Some courts seem to view the "reasonable accommodation" inquiry not as a separate claim, but simply as a part of the handicap discrimination inquiry. *See, e.g., Gardner*, 752 F.2d at 1279–80. On this view, the issue of reasonable accommodation is not reached unless an adverse employment decision *because* of the plaintiff's handicap is first shown. This interpretation essentially makes § 501 dovetail with § 504. Other courts have explained that "reasonable accommodation" is a different kind of discrimination—something easier to prove than traditional disparate treatment or disparate impact discrimination. *See, e.g., Prewitt*, 662 F.2d at 305 & n. 19, 307–08.[2] Finally, a number of courts appear to have recognized a reasonable accommodation claim under § 501. *Langon v. Department of Health & Human Serv.*, 959 F.2d 1053, 1057–58 (D.C.Cir.1992); *Fuller v. Frank*, 916 F.2d 558, 561 (9th Cir.1990); *Rodgers v. Lehman*, 869 F.2d 253, 258–59 (4th Cir.1989); *Carter v. Bennett*, 840 F.2d 63, 65 (D.C.Cir.1988); *see also Ristoff*, 839 F.2d at 1244. The language of the statute and regulations tends to support the latter view. Section 501 calls for "affirmative action," not merely nondiscrimination, and the regulations promulgated under the section give a prominent role to the task of accommodation:

An agency shall make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

29 C.F.R. § 1613.704(a). Moreover, the Supreme Court relied on the *absence* of "affirmative action" language in § 504 in concluding that it does not demand steps beyond "evenhanded treatment"—the clear implication being that § 501 does demand such steps. *Southeastern Community College v. Davis*, 442 U.S. 397, 410–11, 99 S.Ct. 2361, 2369–70, 60 L.Ed.2d 980 (1979). We shall assume that McWright may pursue a separate claim based on the DOE's failure to make a reasonable accommodation of her handicap under § 501. Again, however, we need not decide the matter. The district court treated McWright's complaint as alleging a single claim, and we conclude below that its dismissal of her complaint should be set aside in any event.

▄▄▄ Assuming that McWright may pursue the failure to accommodate as a separate claim, we conclude that her claim must survive the DOE's motion to dismiss. The applicable regulation includes three basic elements: (1) the plaintiff must be a qualified individual with a handicap; (2) the agency must make "reasonable accommodation" for the handicap; and (3) an accommodation need not be made if it would impose an "undue hardship." 29 C.F.R. § 1613.704(a); *Fuller*, 916 F.2d at 561. The DOE does not dispute that McWright is qualified or that she has a handicap. The regulations define the protected class of handicapped individuals to include any

---

**1.** There are procedural and remedial differences between § 501 and § 504 of the Rehabilitation Act. The "remedies, procedures, and rights" of Title VII of the Civil Rights Act of 1964 are available under § 501, while those of Title VI apply to § 504. 29 U.S.C. § 794a(a)(1) & (2); *see also McGuinness*, 744 F.2d at 1319–21. McWright has met the procedural and exhaustion requirements under both provisions.

**2.** The court in *Prewitt* relied on a commentator's four-part classification of discriminatory barriers encountered by individuals with handicaps: (1) intentional discrimination for reasons of social bias; (2) neutral standards with disparate impact; (3) surmountable impairment barriers; and (4) insurmountable impairment barriers. 662 F.2d at 305 n. 19 (citing Note, *Accommodating the Handicapped: The Meaning of Discrimination Under Section 504 of the Rehabilitation Act*, 55 N.Y.U.L.Rev. 881, 883–84 (1980)).

person with a physiological disorder affecting the reproductive system. 29 C.F.R. § 1613.702(b)(1). As for the balance between "reasonable accommodation" and "undue hardship," these matters are questions of fact and thus generally inappropriate for resolution on the pleadings. McWright alleges that the DOE failed to make a reasonable accommodation of her handicap (sterility) by imposing onerous burdens and failing to show flexibility in granting child-care leave. She also alleges that the DOE would not have suffered undue hardship by granting her leave requests. Her allegations are certainly adequate to survive dismissal on the issue of what sort of action by her employer would reasonably accommodate her sterility without posing an undue hardship. Indeed, the regulations promulgated under § 501 expressly contemplate the type of accommodation requested by McWright: "Reasonable accommodation may include, but shall not be limited to ... part-time or modified work schedules...." 29 C.F.R. § 1613.-704(b).

■ We reject the DOE's contention that McWright is simply requesting more favorable treatment than that afforded biological mothers. McWright's claim is that the DOE effectively denied her child-care leave while routinely granting such leave to biological mothers. It is true that McWright requests a change in the (supposedly neutral) standard operating procedure—but that is the essence of reasonable accommodation. On remand, of course, the DOE will have an opportunity to make a showing that the accommodation desired by McWright would cause the agency undue hardship. But accepting McWright's allegations (as we must at this procedural stage), we must assume that the DOE could accommodate her handicap without undue hardship. We also reject the district court's suggestion that McWright's claim was defective because the accommodation she requested "was not related to any specific condition of her work." *McWright*, 771 F.Supp. at 259. Child-care leave is related to work in the relevant sense. The Rehabilitation Act calls for reasonable accommodations that permit handicapped individuals to lead normal lives, not merely accommodations that facilitate the performance of specific employment tasks.

■ Count II of McWright's complaint is a straightforward discrimination claim, one that (substantively, at least) might as easily come under § 504 as under § 501. In this claim McWright alleges that the DOE "treated [her] requests for leave less favorably than those of biological mothers because, due to her inability to bear children, [she] could neither provide a medical certification for her leave nor specify in advance the particular dates for her leave." Complaint ¶ 56. McWright thus alleges that she was actually *treated differently* from biological mothers. Complaint ¶¶ 52–55. But she also indicates that the *reason* for the different treatment was her inability to specify in advance the dates of her leave. Complaint ¶ 56. McWright describes her discrimination claim as one of "disparate treatment," a term that is ordinarily defined as intentional discrimination—in this context, discrimination *because of* McWright's handicap. *See Pime v. Loyola Univ. of Chicago*, 803 F.2d 351, 355 (7th Cir.1986) (Posner, J., concurring).

This reveals a potential problem. If McWright is simply challenging a policy that requires several months' advance notice to obtain child-care leave, then her challenge does not appear to be one of intentional discrimination on the basis of handicap. The district judge recognized this problem, reasoning that the "causal nexus" between the alleged discrimination and McWright's sterility was too attenuated to serve as the basis for a handicap discrimination claim. *McWright*, 771 F.Supp. at 259. Judge Norgle's concerns are understandable. As he explained, the DOE's apparent requirement of advance notice for child-care leave would apply equally to an employee who could bear a child but who chose to adopt. And it would apparently apply to a non-handicapped employee who adopted a child because her husband was sterile. These considerations suggest that the DOE's policy was not really directed at McWright's handicap—sterility. Perhaps it could be said that the

policy discriminates on the basis of her decision to adopt, but, as Judge Norgle noted, one's status as an adoptive parent is not itself a handicap. *Id.*

These same considerations give us pause as well. They presuppose, however, that McWright's discrimination claim is conceived as relying strictly on a "disparate treatment" theory (i.e., one of intentional discrimination on account of handicap) rather than a theory of "disparate impact." In fact, the complaint's heading for this second claim—"Disparate Treatment"—is somewhat surprising, for in many ways Count II sounds like a classic disparate *impact* claim. It appears (at least from paragraph 56 of the complaint) to involve a facially neutral requirement that burdens sterile women more heavily than nonsterile women.

Despite these difficulties, we ultimately conclude that McWright's handicap discrimination claim should not be dismissed, for three reasons.

First, the line between disparate treatment and disparate impact is actually finer than the above discussion suggests, particularly in the context of handicap discrimination. We have warned that an employer cannot be permitted to use a technically neutral classification as a proxy to evade the prohibition of intentional discrimination. An example is using gray hair as a proxy for age: there are young people with gray hair (a few), but the "fit" between age and gray hair is sufficiently close that they would form the same basis for invidious classification. *See Finnegan v. Trans World Airlines, Inc.,* 967 F.2d 1161, 1163 (7th Cir.1992). Similarly, discrimination "because of" handicap is frequently directed at an effect or manifestation of a handicap rather than being literally aimed at the handicap itself. Thus, a school's exclusion of a service dog has been held to be discrimination "because of" handicap, *Sullivan v. Vallejo City Unified Sch. Dist.,* 731 F.Supp. 947, 958 (E.D.Cal.1990), and no doubt a policy excluding wheelchairs would be such discrimination, even if the stated purpose of the policy were a benign one, *see id.* The point is that the distinction

between disparate treatment and disparate impact becomes fuzzy at the border, and McWright might conceivably be able to show that this is one of those "proxy" situations where a case may be made for "constructive" disparate treatment, if not actual disparate treatment. Consider, for example, the question why the DOE places such a premium on knowing well in advance the precise dates of an employee's child-care leave. No one, of course, would expect to have such advance notice for sick leave. Presumably it is easier to run an office with such knowledge; but could it not also have to do with a subtle but strong presumption in favor of biological mothers—and, concomitantly, against women incapable of being biological mothers? Indeed, even if the DOE's apparent policy disadvantages *all* adoptive mothers (including reproductively normal ones), the "fit" may be sufficient, for the underlying attitude might still be a negative one aimed at those incapable of bearing children. The previous four sentences are mere judicial speculation, of course, but they serve to make the point that McWright deserves the opportunity to argue about these issues beyond her complaint.

■ Second, it appears that McWright may pursue her discrimination claim under a disparate impact theory. In *Alexander v. Choate,* 469 U.S. 287, 299, 105 S.Ct. 712, 719, 83 L.Ed.2d 661 (1985), the Supreme Court addressed disparate impact claims under § 504 of the Rehabilitation Act. While the Court "reject[ed] the boundless notion that all disparate-impact showings constitute prima facie cases under § 504," it assumed that § 504 reaches at least some facially neutral conduct with a disparate impact on the handicapped. The Court pointed to strong evidence in the legislative history of the Act suggesting that it was designed to cover more than merely disparate treatment situations. "Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." *Id.* at 295, 105 S.Ct. at 717 (footnote omitted). The Court also noted that several courts of appeals have agreed that

the Rehabilitation Act reaches disparate impact discrimination. *Id.* at 297 n. 17, 105 S.Ct. at 718 n. 17 (citing, *inter alia, Jones v. Illinois Dep't of Rehabilitation Serv.,* 689 F.2d 724 (7th Cir.1982)); *see also, e.g., Prewitt,* 662 F.2d at 305 (Postal Service's armlifting requirement). While the authorities that have addressed the disparate impact issue have done so in the context of § 504, it seems clear that the same principles apply with equal or greater force to § 501 (greater because of the affirmative duties imposed by the latter section). The dual purposes of the Act also support the notion that at least some disparate impact discrimination is covered: the Act was intended to increase the participation in society of individuals with handicaps and to ensure that such individuals are not denied benefits because of prejudiced attitudes and ignorance. *Id.* 469 U.S. at 300, 105 S.Ct. at 719; *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 284, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987). McWright is entitled to proceed beyond the pleadings and attempt to make a showing of disparate impact. The only possible problem is that McWright's complaint contains the words "Disparate Treatment" under the heading "Count II." We do not think, however, that this is a strong enough buckler to preclude McWright's reliance on a disparate impact theory of discrimination. Count II is essentially a discrimination claim. "Disparate treatment" and "disparate impact" are simply legal theories borrowed from Title VII, *see, e.g., Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), and it is not entirely clear how neatly they fit into the scheme of the Rehabilitation Act. The actual allegations in the complaint adequately support a disparate impact approach to a discrimination claim.

Third, even if we were to hold McWright to a strict version of the disparate treatment theory it is not clear that dismissal would be proper, for the intent issue is not entirely foreclosed by the complaint. In spite of paragraph 56 of the complaint, it is not clear from the allegations whether the DOE applied a no-leave-without-notice policy to adoptive mothers generally, or only to McWright as a sterile mother. Paragraphs 52 through 55 simply allege that the DOE treated McWright differently from biological mothers in its attachment of conditions and denial of requests for leave. There is no suggestion of adoptive mothers who are not sterile receiving the same treatment as McWright. In addition, paragraph 20 indicates that McWright's supervisor intentionally (or at least knowingly) placed particularly onerous burdens on McWright by increasing her workload the day after McWright had agreed to complete her assignments before taking her leave. An inference of disparate treatment on the basis of McWright's handicap may therefore by supported by the allegations.

■ Finally, we note that the DOE's argument regarding the proposed "Family and Medical Leave Act" is without merit.[3] The DOE contends that Congress, by considering a comprehensive statute that would have addressed medical and family leave, has implicitly rejected any application of the Rehabilitation Act to family leave policies. As McWright points out, however, such reasoning is flawed. We assume that an employer could not impose a policy prohibiting family leave for any woman over the age of 40; yet on the DOE's theory, such a policy would be insulated from review under age discrimination law merely because Congress has considered legislation governing leave policies. The fact that Congress has addressed leave policies in other legislation simply does not mean that the Rehabilitation Act does not cover such policies.

## III.

Because McWright's complaint adequately states a claim under the Rehabilitation Act, the judgment of the district court is REVERSED and the case is REMANDED for

---

**3.** The bill was vetoed in June 1990 and has been reintroduced in the House of Representatives but not enacted. *See* H.R.Rep. No. 102–135, 102d Cong., 1st Sess., pt. 1 (1991).

further proceedings in accordance with this opinion.