

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-31-2005

# Comm Ser Inc v. Wind Gap Mun Auth

Precedential or Non-Precedential: Precedential

Docket No. 04-2255

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Comm Ser Inc v. Wind Gap Mun Auth" (2005). *2005 Decisions*. Paper 576.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/576

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 04-2255

———————

COMMUNITY SERVICES, INC.,
t/a COMMUNITY SERVICES GROUP

v.

WIND GAP MUNICIPAL AUTHORITY,
                              Appellant

———————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 02-cv-08366)
District Judge:  Honorable Mary A. McLaughlin

———————

Argued January 24, 2005
Before:  SCIRICA, Chief Judge, and
RENDELL, and FISHER, Circuit Judges


(Filed: August 31, 2005 )

Robert J. Sugarman  [ARGUED]
Sugarman & Associates
Robert Morris Building, 11th Floor
100 North 17th Street
Philadelphia, PA   19103

*Counsel for Appellant*

J. Dwight Yoder
Gibbel, Kraybills & Hess
41 East Orange Street
Lancaster, PA  17602

Robert W. Meek [ARGUED]
Disabilities Law Project
1315 Walnut Street, Suite 400
Philadelphia, PA  19107

*Counsel for Appellee*

_____

OPINION

_____

2

RENDELL, Circuit Judge

Community Services, Inc., t/a Community Services Group ("CSG"), a for-profit corporation that provides caretaker services for persons with disabilities, brought this action against the Wind Gap Municipal Authority ("Authority"), the municipal agency that administers sewer services in Wind Gap Borough, alleging violations of the Fair Housing Amendments Act ("FHAA"), 42 U.S.C. § 3601 et seq. CSG claims that the Authority violated the FHAA by charging increased fees to, and imposing additional administrative burdens upon, a house leased and used by CSG to provide caretaker services to three mentally retarded women residing there on the basis that the house was a "personal care home," and hence a "commercial" facility, under the relevant regulations governing sewer service. The District Court granted summary judgment to CSG, principally because it concluded that the Authority's classification of the house as a "personal care home" was a proxy for handicapped status and, therefore, the regulation discriminated on its face based on disability. Because we disagree with the District Court's conclusion that the regulatory classification and treatment of the house constituted disparate treatment "because of" a handicap, we will reverse and remand.

## I. Factual Background

The house at issue is a single-story, three-bedroom home located in a residential community at 250 East First Street, Wind Gap Borough, Northampton County, Pennsylvania. The house was built in 1965 by the family of one of its current residents, Cindy A. Both Cindy and her mother lived in the home until 1999.

In 1995, as Cindy's mother's health was declining, the family established a trust for the benefit of Cindy and her three siblings. One of the primary purposes of the trust was to ensure that Cindy, who was born with Down's Syndrome, would be adequately cared for as she and her mother grew older. To this end, the deed to the house was transferred to the trust, and Cindy's sister arranged for in-home services for Cindy and her mother through the Northampton County Mental Health/Mental Retardation Office ("MH/MR Office") and the Northampton County Office of Aging, respectively. By 1997, the in-home services had been increased to include a full-time caretaker. In November 1999, Cindy's mother moved out of the house and into a nursing home.

Cindy continued to live in the house with the assistance of a full-time caretaker funded jointly by her family and the MH/MR Office. The following year, however, when the County and the family determined that they no longer had the resources to continue funding full-time, personal assistance for Cindy,

they arranged for two other women in need of similar services, Cassie and Linda, to move into the house permanently in December 2000. All three women, adults in their forties and fifties, have mental retardation and, as the District Court found, although they are substantially limited in their ability to learn, work, communicate, and care for themselves, with the assistance of a caretaker, the women are able to conduct their daily life activities and live together in a family-like manner.

The caretaker services are provided by CSG, which provides both residential and non-residential services to persons with disabilities in several counties in Pennsylvania, including Northampton County. CSG leases the house from the trust and works with the MH/MR Office to meet state and federal requirements, including the documentation incident to the performance of services and obtaining reimbursement from funding sources. CSG's caretakers assist Cindy, Cassie, and Linda with their daily activities, such as bathing, food preparation, housecleaning, and transportation (via a mini-van garaged at the house) to the women's day program and vocational rehabilitation. The women do not require or receive clinical care, therapy, rehabilitation, or other similar services at the home. Typically, there are one or two caretakers at the house when the women are at home and no caretakers in the house when the women are at their programs during the day. One caretaker stays overnight, but does not sleep in the house. Once a month the caretakers have a two-hour meeting with a supervisor at the house.

5

In September 2000, CSG obtained zoning approval from the Wind Gap Zoning Hearing Board in preparation for Cassie's and Linda's move to the house. Although the house was zoned for use as a single-family dwelling but not a group home, the Board granted a variance, as a reasonable accommodation under the FHAA, for CSG to operate a "Community Living Arrangement" at the house. The Board subsequently notified the Borough of Wind Gap and the Authority of the approval. At meetings of the Authority's board, Cindy's sister and CSG's regional director explained that CSG would provide caretakers to assist the residents, that the house would be used as a family residence, and that there would be no change in the use of the property.

On October 16, 2000, the Authority sent Cindy's sister a letter informing her that it was necessary to apply for a sewer connection permit and submit a feasibility review agreement along with a $500 deposit to determine the use of the home. CSG submitted the feasibility review agreement, applied for a sewer connection permit, and submitted the deposit on November 9, 2000. At the same time, CSG also requested a reasonable accommodation under the FHAA to allow the house to remain classified as residential. As explained in a letter dated November 13, 2000, the Authority returned the uncashed check

and declined to consider the application because the documents were not executed by the deed owner, i.e., the trust.[1]

In December 2000, CSG notified the Authority that Linda and Cassie were moving into the house that month. In January 2001, the Authority changed the house's sewer service classification from "residential" to "commercial" and increased the number of "Sewer Billing Units" ("SBUs") or "Equivalent Dwelling Units" ("EDUs"), the measure by which the Authority charges for sewer service, from one to two. Under the "Rules and Regulations Governing Sewer Services When Obtained from Sewer System of Wind Gap Municipal Authority" ("Regulations") in effect at the time, a "Residential Unit" was defined as "a private dwelling unit, a dwelling unit in a double house or in a row of connecting houses, or a dwelling unit in an apartment building, condominium or in any other multiple dwelling or multiple use structure," and all such units were assessed one (1) SBU. The "Commercial Unit" classification was defined by a schedule assessing a variable number of EDUs to a unit based on whether it was considered, inter alia, a "House, Apartment, or Condominium"; "Trailer"; "Hotel,

---

[1]The issue of whether the trust, or CSG, had the obligation, or right, to deal with or seek accommodation from the Authority has not been fully developed, although it appears that the record property owner is viewed as having the sole authority to bind and represent the property for the purpose covered by the ordinance.

7

Nursing Home, Personal Care Home, or Boarding House (without Restaurant or Bar, Dining or other Business)"; "Restaurant and/or Bar or Tavern (without Residence)"; "Restaurant and/or Bar or Tavern (with Residence); "Fitness Center without Showers, Pools, Sauna, Hot Tub"; "Offices and Multi-Use Business Facilities"; "Photo Lab"; or "Car Wash."[2]

---

[2]These classifications were defined in Sections 9.02 and 9.03 of Article IX ("Rules for Determining Number of Sewer Billing Units") of the Regulations. These sections were subsequently amended on September 17, 2001, several months after the house was reclassified. Under the revised Regulations, units were classified as "residential" or "non-residential." A "residential dwelling unit" was defined as "a dwelling unit with a kitchen or kitchenette and a bathroom with toilet facilities, whether constructed as a private dwelling unit, a dwelling unit in a double house or in a row of connecting houses, a trailer, or a dwelling unit in an apartment building, condominium or in any other multiple dwelling or multiple use structure." A "non-residential unit" was defined by a schedule divided into three categories, "Home Based Businesses" (businesses operated by a resident and no more than one employee from outside the home), "Commercial Residential Establishments" (including but not limited to hotels, motels, nursing homes, personal care homes, boarding houses, assisted living or any similar facilities), and "Other Commercial Establishments" (including by not limited to restaurants, bars, food stores, fitness centers, banks, etc.). Although the revised Regulations were not used to reclassify the house, as we explain below, an analysis of CSG's

The Authority did not offer an explanation for the reclassification, nor was one requested by the trust or CSG.

In May 2001, the Authority sent a letter to the trust demanding that it pay the $500 deposit and a $2,100 tapping fee. Counsel for CSG responded by requesting that the house be classified as a single-family residence and that the Authority grant a reasonable accommodation. The Authority did not respond. CSG continued to pay the increased quarterly sewage bill under protest. In November 2001, counsel for CSG requested an explanation for the reclassification. The Authority did not respond. On July 3, 2002, the Authority filed a municipal lien for $2,200 against the property for the trust's failure to pay the tapping fee. CSG paid the fee under protest on August 22, 2002 in order to satisfy the lien and CSG's counsel sent a letter to the Authority's solicitor to request an explanation for the reclassification. The solicitor did not respond. On October 7, 2002, CSG's counsel sent a second letter to the solicitor; this letter also went unanswered. The municipal lien on the house was not released until July 16, 2003, subsequent to the filing of the Complaint initiating this action.

---

claims under either version of the Regulations yields the same result.

**II. Procedural History**

CSG filed the instant action on November 7, 2002. See Cmty. Servs. Group v. Wind Gap Mun. Auth., Civ. A. No. 02-8366, 2004 U.S. Dist. LEXIS 6689 (E.D. Pa. Apr. 1, 2004). The Complaint generally averred that in providing services to the house the Authority had violated the FHAA by discriminating against plaintiffs on the basis of the house's residents' disabilities. During discovery, the Administrator of the Authority, Robert D. Hahn, explained for the first time that the Authority reclassified the house because the lessee of the property, CSG, was a for-profit company using the house as a "personal care home," a facility that was expressly included in the "commercial" classification under the Regulations. At the completion of discovery, both parties moved for summary judgment, and after a hearing on February 13, 2004, the District Court granted summary judgment to CSG. The Court concluded that the regulation on which the Authority based the reclassification of the house to "commercial" because it was a "personal care home" discriminated against persons who need "personal care," and because such persons are by definition "handicapped" under the FHAA, the regulation violated the Act. Id. at *1-2.

The District Court first noted that CSG had brought three FHAA claims, the first two alleging that the Authority's policies and actions constituted disparate treatment and disparate impact discrimination and the third alleging that the Authority failed to

10

grant a reasonable accommodation. Id. at *16-18. Of these three claims, the Court focused primarily on the disparate treatment claim, and more specifically, on analyzing whether the regulation upon which the Authority reclassified the house was facially discriminatory. Id. at *18-26. The Court noted at the outset that if the regulation made a classification on the basis of "homes for the handicapped," it would clearly violate the FHAA. Id. at *18. The question, then, was whether the classification of the house as a "personal care home" coincided with or was a "proxy" for this clearly unlawful classification. Id.

The Court discussed the development of the "proxy" theory in a number of facially discriminatory classification cases dealing with proxies for "handicapped" under the FHAA, specifically relying on Horizon House Developmental Services, Inc. v. Township of Upper Southampton, 804 F. Supp. 683, 694 (E.D. Pa. 1992), aff'd, 995 F.2d 217 (3d Cir. 1993), where the District Court had concluded that an ordinance imposing a 1,000-foot distance requirement between homes where "permanent care or professional supervision is present" was facially discriminatory because it singled out for disparate treatment individuals who were unable to live independently and, thus, were "handicapped" under the FHAA definition.[3]

_____

[3]The FHAA defines "handicap" as follows:
   "Handicap" means, with respect to a person–
         (1) a physical or mental impairment which

11

The Court reasoned that because personal care homes provide professional personal care and supervision, and residents who require personal care in their homes are not able to live on their own and need assistance with their daily life activities, "personal care home" was a proxy for "handicapped" and the ordinance was, therefore, facially discriminatory. Cmty. Servs. Group, 2004 U.S. Dist. LEXIS 6689, at *22.

Further, the Court noted that the Authority only first offered an explanation for the reclassification during the litigation when Administrator Hahn explained in his deposition that the house was reclassified because CSG was a for-profit company and the house was being used as a "personal care home," a facility that was expressly included in the "commercial" classification under the Regulations. The Court rejected this explanation because the ordinance did not provide

substantially limits one or more of such person's major life activities,
    (2) a record of having such an impairment, or
    (3) being regarded as having such an impairment,
but such term does not include current, illegal use of or addiction to a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)).
42 U.S.C. § 3602(h).

that only "for-profit" personal care homes were to be classified as commercial, and even if it did, it would still violate the FHAA because the Act does not protect only non-profit entities.

The District Court then turned its attention to whether there was a valid justification for treating personal care homes differently from residential dwellings. It rejected the commercial classification and the Authority's purported interest in applying rates uniformly to all for-profit customers. Id. at *25. The Court did recognize that the Authority had a legitimate interest in using an efficient rating system, but determined that there were less discriminatory alternatives to serve that interest, including actually classifying properties based on for-profit status or single-family residences versus larger buildings, or by basing its ratings on the number of occupants per square foot. Id. at *26.

Having held that the ordinance was facially discriminatory, the Court noted that it need not decide the plaintiff's other two claims based on disparate impact and denial of a reasonable accommodation. However, the Court then proceeded to discuss both claims very briefly, setting out the standards for evaluating such claims and concluding that: (1) the classification would have a disproportionate impact on disabled people as residents of "personal care homes" and, again, the Authority had no legitimate reason for the classification, and (2) the Authority never responded to CSG's numerous letters requesting a waiver of the increased fees and administrative

13

burdens and the Authority had not shown that the request was not reasonable in light of the fact that the sewer usage of the house was less intensive than other "residential" dwellings. Id. at *26-29. At the conclusion of its opinion, the Court noted that "the plaintiff's motion should be granted on those two claims as well." Id. at *28-29.[4]

### III. Jurisdiction and Standard of Review

The Authority appeals the District Court's decision, arguing that the Court erred: (1) in its determination that the for-profit status of CSG was not a valid reason for classifying the house as commercial, (2) in its viewing disputed facts in a light most favorable to the party moving for summary judgment, and (3) in its analysis of the disparate impact and reasonable accommodation claims. The District Court had jurisdiction over CSG's FHAA claims under 28 U.S.C. § 1331 and 42 U.S.C.

---

[4]The status of the request for reasonable accommodation remains unclear. At oral argument and in correspondence to the Court after argument, counsel for the Authority maintained that the Authority would consider a request for a reasonable accommodation by the trust, the deed owner of the property, but did not and would not consider such a request from CSG. As an alternative to the Authority's suggestion that we remand the matter to it to consider such a request by the trust, the parties agreed to attempt to mediate the dispute. Mediation was unsuccessful.

14

§ 3613(a), and we have jurisdiction to review the final decision of the District Court under 28 U.S.C. § 1291. We exercise plenary review over the District Court's grant of summary judgment, applying the same test as the District Court. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976). To affirm the grant of summary judgment, we must be convinced that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law when the facts are viewed in the light most favorable to the non-moving party. Fed. R. Civ. P. 56(c).

## IV. Discussion

### A. FHAA Background

The Fair Housing Act ("FHA"), passed by Congress as Title VIII of the Civil Rights Act of 1968, prohibits housing discrimination on the basis of, inter alia, race, gender, and national origin. 42 U.S.C. § 3601 et seq. Under the FHAA, which Congress passed in 1988 to extend the coverage of the FHA to include people with disabilities, it is unlawful:

> To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection

15

with such dwelling, because of a handicap of–

    (A)  that person; or

    (B)  a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

    (C)  any person associated with that person.

42 U.S.C. § 3604(f)(2). By its express terms, this section applies to "the provision of services or facilities" to a dwelling, such as sewer service, and courts have specifically allowed claims under this section to be brought against municipalities and land use authorities. See generally Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment, 284 F.3d 442 (3d Cir. 2002). Further, under 42 U.S.C. § 3604(f)(3)(B), discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

Plaintiffs alleging violations of the FHAA under these sections may bring three general types of claims: (1) intentional discrimination claims (also called disparate treatment claims)

16

and (2) disparate impact claims, both of which arise under § 3604(f)(2), and (3) claims that a defendant refused to make "reasonable accommodations," which arise under § 3604(f)(3)(B).  See Lapid-Laurel, 284 F.3d at 448 n.3.  To evaluate these claims under the FHAA, courts have typically adopted the analytical framework of their analogues in employment law, including their coordinate burden-shifting analyses once plaintiff has made a prima facie showing of discrimination under a specific claim.[5]

---

[5]See Lapid-Laurel, 284 F.3d at 466 ("[W]hen reviewing disparate impact claims brought under the FHAA, we have borrowed from the framework of Title VII disparate impact claims."); see also, e.g., Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 575 (2d Cir. 2003) ("When examining disparate impact claims under the FHAA and ADA, we use Title VII as a starting point."); Gamble v. City of Escondido, 104 F.3d 300, 304 (9th Cir. 1997) ("We apply Title VII discrimination analysis in examining [FHA] discrimination claims."); Larkin v. Mich. Dep't of Social Servs., 89 F.3d 285, 289 (6th Cir. 1996) ("Most courts applying the FHA, as amended by the FHAA, have analogized it to Title VII of the Civil Rights Act of 1964 . . . ."); Bangerter v. Orem City Corp., 46 F.3d 1491, 1503 (10th Cir. 1995) (looking to "the language of the FHAA itself, and to the manner in which analogous provisions of Title VII have been interpreted" in evaluating a disparate treatment claim).

17

### 1. Disparate treatment: Discriminatory animus claims & facially discriminatory classification claims

Generally, to prevail on a disparate treatment claim, a plaintiff must demonstrate that some discriminatory purpose was a "motivating factor" behind the challenged action. See Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs, 257 F. Supp. 2d 208, 225 (D.D.C. 2003) ("It is well settled that a defendant's decision or action constitutes disparate treatment, or intentional discrimination, when a person's disability was a 'motivating factor' behind the challenged action or decision."); Tsombanidis v. City of W. Haven, 129 F. Supp. 2d 136, 151 (D. Conn. 2001) (citing Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977)). The discriminatory purpose need not be malicious or invidious, nor need it figure in "solely, primarily, or even predominantly" into the motivation behind the challenged action. Cmty. Hous. Trust, 257 F. Supp. 2d at 225; Tsombanidis, 129 F. Supp. 2d at 151; see also Horizon House, 804 F. Supp. at 696 ("In order to prove intentional discrimination it is not necessary to show an evil or hostile motive. It is a violation of the FHAA to discriminate even if the motive was benign or paternalistic."). The plaintiff is only required to "show that a protected characteristic played a role in the defendant's decision to treat her differently." Cmty. Hous. Trust, 257 F. Supp. 2d at 225 (citing Arlington Heights, 429 U.S. at 265).

18

Where a regulation or "policy facially discriminates on the basis of the protected trait, in certain circumstances it 'may constitute per se or explicit . . . discrimination'" because "the protected trait by definition plays a role in the decision-making process, inasmuch as the policy explicitly classifies people on that basis." DiBiase v. SmithKline Beecham Corp., 48 F.3d 719, 726 (3d Cir. 1995) (quoting EEOC v. Elgin Teachers Ass'n, 780 F. Supp. 1195, 1197 (N.D. Ill. 1991)). Hence, where a plaintiff demonstrates that the challenged action involves disparate treatment through explicit facial discrimination, or a facially discriminatory classification, "a plaintiff need not prove the malice or discriminatory animus of a defendant." Bangerter v. Orem City Corp., 46 F.3d 1491, 1501 (10th Cir. 1995). Rather, the focus is on the "explicit terms of the discrimination." Int'l Union, United Auto. Aerospace & Agric. Implement Workers v. Johnson Controls, Inc., 499 U.S. 187, 199 (1991).

## 2. Facially discriminatory classifications: "Proxy" theory

Consistent with the focus on language rather than a showing of discriminatory animus in evaluating facially discriminatory classification claims, courts have developed a "proxy" theory for such claims, recognizing that a regulation or policy cannot "use a technically neutral classification as a proxy to evade the prohibition of intentional discrimination," such as classifications based on gray hair (as a proxy for age) or service

19

dogs or wheelchairs (as proxies for handicapped status). McWright v. Alexander, 982 F.2d 222, 228 (7th Cir. 1992). For example, in Erie County Retirees Ass'n v. County of Erie, we concluded that an employer violates the Age Discrimination in Employment Act ("ADEA") by offering Medicare-eligible retirees different health coverage from that offered to non-Medicare-eligible retirees because "Medicare status is a direct proxy for age," as eligibility "'follow[s] ineluctably upon attaining age 65.'" 220 F.3d 193, 211 (3d Cir. 2000) (alteration in original) (quoting Erie County Retirees Ass'n v. County of Erie, 91 F. Supp. 2d 860, 867 (W.D. Pa. 1999)). Such a situation was, we explained, distinguishable from the situation in Hazen Paper Co. v. Biggins, where an employer's termination of an employee a few weeks prior to attaining ten years of service required for the vesting of pension benefits was held by the Supreme Court not to be disparate treatment under the ADEA because, although age and years of service may "correlate," they are "analytically distinct . . . and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'" 507 U.S. 604, 611 (1993). Our conclusion in Erie County that Medicare status is "an age-based criterion" was consistent with the reasoning of the Court of Appeals for the Second Circuit in Johnson v. New York, 49 F.3d 75 (2d Cir. 1995). There, the court held that an air base's termination of a security guard when the guard attained age 60 and could not maintain active status in the Air National Guard due to forced resignation in that organization violated the ADEA because the plaintiff's "age and termination [we]re

20

inextricably linked" and the sole cause of plaintiff's loss of dual status and his consequent termination was his age. Id. at 79-80.[6]

### 3.    Discrimination "because of a handicap"

Regardless of whether plaintiff frames a disparate treatment claim under the FHAA as one alleging discriminatory animus or one alleging a facially discriminatory classification, the most fundamental element of the claim is that plaintiff must demonstrate that defendant's alleged discrimination was "because of a handicap." 42 U.S.C. § 3604(f)(2). This requirement, plainly read from the language of the FHAA, is very often glossed over or, perhaps, so obvious as not worthy of discussion.[7] Here, however, it does appear to us to be so

---

[6]Consistent with Johnson Controls and DiBiase, we also noted in Erie County that whether the employer possessed a "malevolent motive or acted on the basis of hostile age-based stereotypes [wa]s irrelevant" as "a policy explicitly based on a prohibited factor . . . is illegal regardless of the underlying motive." 220 F.3d at 212 (quoting Johnson Controls, 499 U.S. at 199-200).

[7]For example, in a claim alleging discriminatory animus, where plaintiff adduces evidence that defendant had an "intent" to discriminate, the showing of intent easily satisfies to prove the proscribed "basis." However, "intent" to discriminate and "basis" for discrimination are fundamentally different concepts. "Intent" need not be proven in a facially discriminatory

21

obvious and thus the focus of our inquiry on this point is whether "handicapped" or "disabled" status–the protected trait under the FHAA–was being used as the <u>basis</u> for different treatment.  <u>Cf.</u> <u>DiBiase</u>, 48 F.3d at 726 (explaining that inquiry involves whether a "policy facially discriminates <u>on the basis of the protected trait</u>" and "explicitly classifies people <u>on that basis</u>") (emphasis added).

      In the context of a facially discriminatory classification claim, to determine whether the basis of the alleged discrimination is indeed handicapped status, we must examine the language of the challenged regulation or policy, aided, if applicable, by any evidence of record that informs the analysis.  For example, as we indicated above, a classification based on "service dogs" could, in many contexts, constitute a proxy for discrimination "because of" a handicap.  However, were the challenged regulation to require "all domesticated dogs" to submit to mandatory vaccination, the express inclusion of "service dogs" would not discriminate "because of" a handicap, it would discriminate because a service dog is a "domesticated dog."  Here, we need to determine whether

_____

classification claim or in a disparate impact claim, both of which arise under § 3604(f)(2).  However, to make out <u>any</u> claim for discrimination (under the FHAA or another law) the improper "basis" must be shown to be at the heart of the classification or conduct.

22

different treatment of a "personal care home" was necessarily "disability based."

**B.      Analysis**

The District Court concluded that because "personal care home" coincided with the FHAA's definition of "handicap," the use of the term constituted facial discrimination because of a handicap and, consequently, the Authority's assessment of increased fees and burdens to the house violated the FHAA. Yet, we are not so sure.  First, we question whether, on this record, "personal care home" necessarily means "home for the disabled or handicapped."  "Handicap" is defined under the FHAA as "(1) a physical or mental impairment which substantially limits one or more of [a] person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment."  42 U.S.C. § 3602(h); see also supra note 3.  "Personal care home," however, is nowhere defined in the regulation at issue.  On its face, the term "personal care home" has nothing to do with handicapped or disabled status.  Without any context to inform our interpretation of this term, "personal care home" could fairly be used to describe any number of facilities providing services to residents who may not necessarily have, have had, or be regarded as having a physical or mental impairment that substantially limits a major life activity under the FHAA definition of "handicap."  This could include a home where the elderly; juveniles (including juvenile delinquents, abused or

23

neglected children, or orphans); the homeless; battered women; or ex-criminal offenders would be cared for. See, e.g., Horizon House, 804 F. Supp. at 694; Alliance for the Mentally Ill v. City of Naperville, 923 F. Supp. 1057, 1071 (N.D. Ill. 1996).

Second, even if "personal care home" were equated with "homes for the disabled or handicapped," we do not believe that the regulatory classification of such a house as "commercial" was necessarily "because of" the disabled or handicapped status of the house's residents rather than the "commercial" nature of CSG as the lessee of the property. The testimony of Administrator Hahn offers further support for a non-discriminatory rationale. Thus, we do not agree that this case lends itself to a facially discriminatory classification theory because the challenged regulation does not "facially" discriminate against CSG "because of" the handicapped status of the residents.

Although we are examining the classification on its face, we should nonetheless look at the record evidence and go beyond the use of a potentially "technically neutral classification," McWright, 982 F.2d at 228, so as to ferret out any indicia that the disparate treatment was covertly "because of" a handicap, and also to see if the opposite is the case. In this sense, the term "facially discriminatory classification" seems to be a bit of a misnomer, but it is not, for we are scrutinizing conduct to better understand the basis for the facial treatment.

24

We find this fact pattern to be distinguishable from most of the true "proxy" cases where courts have had little difficulty leaping from the term "personal care home"–or something substantially equivalent–to discrimination based on handicapped status because it was obvious, in light of the language and the record evidence, that the term was used to classify plaintiff's facility and treat it differently "because of" the disabled status of the facilities' residents. See, e.g., Larkin v. Mich. Dep't of Social Servs., 89 F.3d 285 (6th Cir. 1996); Cmty. Hous. Trust, 257 F. Supp. 2d 208; Children's Alliance v. City of Bellevue, 950 F. Supp. 1491 (W.D. Wash. 1997); Alliance for the Mentally Ill, 923 F. Supp. 1057; Horizon House, 804 F. Supp. 683. A review of these cases reveals that this leap was aided by a combination of four common elements that are lacking here: first, the alleged discriminatory classification was actually defined by the challenged regulation in terms that largely coincided with the FHAA definition of "handicap"; second, the classification was used specifically to "single out" facilities for handicapped individuals for different treatment "because of" their disability; third, there was often direct or circumstantial evidence of discriminatory animus indicating an intent to discriminate "because of" the disabled status of the facilities' residents; and fourth, the defendant's purported reason for treating plaintiff's facility differently was predicated on a justification for treating disabled persons differently that was of questionable legitimacy.

25

In both Larkin and Horizon House, the courts struck down laws that imposed distance requirements between residential care facilities for persons who were "handicapped" under the FHAA. In each case, the challenged law "singl[ed] out for regulation group homes for the handicapped" with a classification comprising only such facilities. Larkin, 89 F.3d at 290 (noting that the Act, by its very terms, applied "only to [adult foster care] facilities which . . . house the disabled, and not to other living arrangements"); see also Horizon House, 804 F. Supp. at 694 (concluding that defendant township's reactionary enactment of an ordinance imposing a distance requirement between plaintiff's "family care homes" "singled out for disparate treatment . . . those who are unable to live on their own [and] who, in the language of the Fair Housing Act, are 'handicapped'"). In Alliance for the Mentally Ill, Children's Alliance, and Community Housing Trust, the courts invalidated laws that singled out for regulation group homes for the handicapped by distinguishing "family" homes from either "residential board and care occupancies," "group facilities," or "community-based residential facilities," each latter classification constituting a proxy for "handicapped" status. Alliance for the Mentally Ill, 923 F. Supp. at 1070 (noting that although the municipal fire code did not use the words "handicapped" or "disabled," special provisions for "residential board and care occupancies"–defined as facilities that house four or more unrelated persons "for the purpose of providing personal care services"–applied primarily to handicapped persons); Children's Alliance, 950 F. Supp at 1496 (determining

26

that distinguishing "families" from "group facilities" based on the presence of a "staff" providing "care and supervision for and assistance with the daily living activities" was "a proxy for a classification based on the presence of individuals under eighteen and the handicapped as both groups require supervision and assistance" and, therefore, facially discriminated on the basis of familial and handicapped status); Cmty. Hous. Trust, 257 F. Supp. 2d at 221-22 (concluding that the definition of a "community-based residential facility" as "a residential facility for persons who have a common need for treatment, rehabilitation, assistance, or supervision in their daily living" called for the application of different standards to persons on the basis of their disability, even though the law did not make such a distinction expressly).

These cases are fundamentally different from what we have here. First, regarding the language of the challenged regulation, each of the above-cited cases involved a classification that was expressly defined in terms that the court found coincided with the FHAA definition of "handicap." As we discussed above, here, the challenged classification–"personal care home"–is not defined at all under the regulation. Consequently, there is nothing on the face of the regulation to suggest that "personal care home" necessarily means "home for the disabled."

Second, also regarding the language of the challenged regulation, in the above-cited cases the challenged classification

27

was used to "single out" only facilities for the disabled for different treatment with the only possible explanation being that it was "because of" the disabled status of their residents. The disabled status of the facilities' residents was the dispositive trait for the facilities' classification and different treatment. In the instant matter, however, the classification of the many facilities subject to increased fees and burdens associated with sewer service–the alleged discrimination–was broad-based, with different sewer charges assessed against numerous different types of facilities based on whether they were deemed "residential" or "commercial." The term "personal care home"–the alleged proxy for disabled status–was not used to "single out" facilities for assessment of increased fees. Rather, the term was included in an illustrative list of a number of different types of facilities used to encompass what the Authority deemed to be "commercial" for the purpose of assessing fees. Further, far from being singled out, "personal care home" was grouped with other multi-adult rooming facilities in a subset of the "commercial" list. This subset included "hotels," "motels," "nursing homes," and "boarding houses," the common characteristic of which appears to be that all such facilities provide room and boarding services. Given that the facilities in this group typically charge a fee for the provision of these services, the logical inference is that "personal care homes" fit within this subset of the "commercial" category because "personal care homes" typically board adults and have a "commercial" quality. As such, the label "personal care home" does not, on its face, "single out for regulation

28

group homes for the handicapped" in the same way as was present in the other cases referred to above. Larkin, 89 F.3d at 290. Disabled status was not, at least ostensibly, the dispositive trait for different treatment. Additionally, this use of the term "personal care home" does not demonstrate that "the protected trait by definition plays a role in the decision-making process" by classifying people on that basis.[8] DiBiase, 48 F.3d at 726.

Third, beyond the language of the regulation, in a number of the above-cited cases there was direct or circumstantial evidence of discriminatory animus directed at plaintiff's facility

---

[8]The same conclusion follows from an evaluation of the language used in the revised Regulations. Under the revised Regulations, the primary classifications for assessing sewer fees are "residential" and "non-residential" (rather than "commercial"). "Personal care home," listed under the "non-residential" classification, is further classified as part of a group titled "Commercial Residential Establishment[s]," defined as "including but not limited to: Hotel or Motel, Nursing Home, Personal Care Home, Boarding House, Assisted Living or any similar facility." Regarding the classification of "personal care home," the revised Regulations are not materially different from the original Regulations, and, indeed, the fact that "personal care home" is listed in a group expressly labeled "Commercial Residential Establishment[s]" clearly indicates that the dual "residential-commercial" character of these facilities, rather than disabled status of their residents, is the basis for their being classified as "non-residential."

29

because the facility provided services to handicapped individuals. Although a plaintiff need not prove–and, consequently, a court need not find–"malice or discriminatory animus of a defendant" under a facial discrimination claim, Bangerter, 46 F.3d at 1501, clearly, evidence of some intent to disadvantage a class of people makes the determination of the basis for the overt disparate treatment much easier. See supra note 7. There is no evidence in the record here that the enactment of the regulatory provision or the Authority's reclassification of the house was motivated by any discriminatory animus.[9] Unlike the circumstances in Horizon House, the Authority did not enact the Regulations in response to CSG's seeking zoning approval with the specific intent to burden CSG, the trust, or the residents of the house. The Regulations used to reclassify the house were already in force. Also, unlike Horizon House, Alliance for the Mentally Ill,

---

[9]The District Court expressly noted that "[a]lthough CSG argues that there is evidence that the Authority was motivated by discriminatory animus, the facial discrimination claim is the basis of its motion for summary judgment." Cmty. Servs. Group, 2004 U.S. Dist. LEXIS 6689, at *17; see also Pl.'s Mem. of Law in Supp. of Pl.'s M. for Summ. J. at 18 n.2 ("Although there is evidence in this case that Defendant's actions . . . were motivated by discriminatory animus and/or the status of the residents, Plaintiff is not pursuing summary judgment based on an animus theory of disparate treatment. However, if this Court denies summary judgment, Plaintiff reserves the right to present that theory at trial.").

30

Children's Alliance, and Community Housing Trust, there is no indication that there was any opposition by neighbors or other agencies of the municipality. Indeed, the zoning approval process, the hurdle at which a number of plaintiffs in the above-cited cases fell, ended successfully for CSG with the Zoning Hearing Board granting a variance to allow CSG to provide caretaker services at the house. Lastly, there was no "circumstantial evidence" of discriminatory animus of the character noted in Children's Alliance; there was no evidence of a policy to "protect the neighborhood from the adverse impacts" of group homes nor is Wind Gap lacking group homes.

Fourth, and last, in the above-cited cases, each defendant's purported reason for treating plaintiff's facility differently was predicated on some justification for treating disabled persons differently, and such justification was found by the court to be unsupported or otherwise invalid.[10] Whereas in

---

[10]Admittedly, that each defendant's reason was framed as a "justification" is due to the burden-shifting aspect of the complete "discriminatory classification" analysis, i.e., once the court determines that the regulation is facially discriminatory, the burden shifts to the defendant to justify the discrimination. In this sense, the defendant is forced, in anticipation of the court's conclusion on this point, to provide a rationale for the challenged regulation that references a justification for treating disabled persons differently. To apply this concept here and conclude that because the Authority's reason for the

31

these cases the reason for different treatment seemed little more than makeweight, here we view it–upon initial examination (which is all we really have presented to us as a matter of record)–to be reasonable. It is not unreasonable, and most likely within the discretion of the Authority as a matter of policy, to presume that "commercial" facilities have a greater proportionate use of the municipality's sewer service as compared to "residential" units and, therefore, should bear a greater proportionate share of the cost of maintaining the system. It is also not unreasonable and likely within the Authority's discretion to classify a facility exhibiting both commercial and residential qualities as "commercial" for this purpose. Hence, the Authority's explanation that the house was reclassified because it was being run by a for-profit corporation is not unreasonable or inconsistent with a plain reading of the regulation. Cmty. Servs. Group, 2004 U.S. Dist. LEXIS 6689, at *23.

---

reclassification of the house was not predicated on some justification for treating disabled persons differently, the Authority must really have been treating CSG differently because it is a commercial entity, is circular and ignores the context in which this inquiry is made. However, given that the court must ultimately assess the validity of the reason for defendant's disparate treatment (whether framed as a justification for treating the disabled differently or not), a similar assessment of the validity of the Authority's reason is informative here.

32

As the District Court noted, the Authority did not explain why it was reclassifying the house when it did; this explanation was provided by Administrator Hahn in his deposition. Id. The District Court found this explanation to be unpersuasive for two reasons. First, the classification did not state that only "for-profit personal care homes" would be reclassified to "commercial," and schools and churches, which are typically not "for-profit," were classified as "commercial." Id. Second, even if the classification did apply to for-profit personal care homes, it still violated the FHAA because "'[t]he FHAA does not require group home providers to give away their services, to operate at a loss, nor to declare a particular tax status. If it did, there would be far fewer residences for disabled persons than there presently are.'" Id. at *23-24 (quoting United States v. City of Chicago Heights, 161 F. Supp. 2d 819, 844 (N.D. Ill. 2001)).

Regarding the District Court's first reason, as noted above, the primary classification used to assess sewer charges, per the original Regulations, was whether a unit was deemed "residential" or "commercial." That the label "personal care home" is included in the "commercial" classification indicates that all personal care homes, whether "for-profit" or "non-profit," are deemed by the Authority to be "commercial." Given this, we cannot agree that the failure to limit the definition of "commercial" to "for-profit personal care homes" requires that the house here must be deemed "residential." Furthermore, CSG is a for-profit company. Were CSG a non-

33

profit entity, there would be a stronger argument that the classification of its facility as "commercial" was an unreasonable application of the Regulations. This is the principle the District Court was invoking in referencing the Regulations' classification of schools and churches as "commercial." However, such an as-applied challenge to the Authority's (mis)classification of a facility based on its "commercial" versus "residential" character is not the basis of CSG's FHAA claim that the Regulation facially discriminates on the basis of disability.[11]

The District Court's second reason for rejecting the Authority's explanation for reclassifying the house was that the FHAA does not require group home providers to be non-profit, relying on City of Chicago Heights, 161 F. Supp. 2d at 844. In that case, the Court struck down a zoning code that required all group homes to be operated by non-profit agencies. The Court

---

[11]Cf. Alliance for the Mentally Ill, 923 F. Supp. at 1074 ("[R]esidents of lodging and rooming houses are not a protected class under the constitution or under any statute, whereas handicapped persons are a specifically protected class under the FHAA. A municipality may impose special requirements on residents of lodging and rooming houses provided that such requirements bear a rational relationship to some legitimate governmental purpose. Undoubtedly, such requirements could rest on generalized assumptions about residents of lodging and rooming houses.") (citations omitted).

34

found the zoning code to violate the FHAA because it reduced the number of residences available for disabled persons. Here, the regulation impacts commercial establishments, assessing a greater fee based on their commercial nature. Neither the language of the regulation nor the record evidence reveals any curtailment of services to the disabled that was apparent in City of Chicago Heights. Accordingly, we do not find that case to be helpful, let alone persuasive.

In short, given the facts as established by the record, we disagree with the District Court's conclusion that the use of the term "personal care home" in the Regulations constitutes a facially discriminatory classification "because of" a handicap under the FHAA. While the term conceivably could be a proxy for discrimination against the disabled in certain circumstances (as very similar terms were in the above-cited cases), as we have explained, this is a very different case. A plain reading of the relevant regulation does not support the District Court's conclusion that "personal care home" is facially discriminatory as singling out CSG for disparate treatment because of the residents' disabilities. Further, there is no record evidence of discriminatory animus directed toward the disabled on the part of the Authority, and the Authority's explanation for the reclassification is not plainly illegitimate or unsupportable.

For the foregoing reasons, we conclude that the District Court erred in determining that the use of the term "personal care home" was a facially discriminatory classification under the

35

FHAA. The language of the regulation and the record evidence do not establish that the use of the term was facially discriminatory "because of" a handicap. Additionally, CSG has not pointed to anything in the record to adequately rebut the Authority's explanation that the reclassification and assessment of increased fees and burdens was based on CSG's "commercial" character. Consequently, the award of summary judgment to CSG on this claim should be reversed. Further, given that there is no genuine issue of material fact on this point, even when viewed in the light most favorable to CSG, summary judgment should be granted in favor of the Authority.

**C.     CSG's     disparate     impact     and     reasonable accommodation claims**

Regarding the District Court's consideration of CSG's disparate impact and reasonable accommodation claims, we believe the Court's analysis is flawed insofar as it followed inexorably from the Court's erroneous determination that the regulation was facially discriminatory. Given that the Court's grant of judgment on the disparate impact claim was based in large part on its erroneous determination that the Authority had not presented a legitimate, non-discriminatory reason for reclassifying the house, this ruling cannot stand. As to the reasonable accommodation claim, we find that there are too many questions of material fact surrounding this claim to support the Court's conclusions that CSG met its burden of

36

proof and that the Authority failed in its burden.[12]  Further, on review of the record, it is clear that both parties (and the Court) were more focused on the discriminatory classification claim and, given the District Court's error in finding a facially discriminatory classification, the record has not been adequately developed to support a grant of summary judgment on either of these claims.

Accordingly, we will remand to the District Court for further proceedings regarding these claims.

---

[12]The most striking factual dispute, evident to us from counsel's post-argument correspondence to the Court, is whether a valid request for an accommodation was presented to the Authority (by CSG or the trust), or whether, if CSG had presented a valid request for an accommodation, the Authority responded.  The existence of this issue undercuts the District Court's theory that CSG should prevail on this claim, at least in part because the Authority failed to respond.  Beyond this issue, the District Court has not explained the bases for its conclusion that CSG has met its burden of proof on a prima facie case for failure to grant a reasonable accommodation, i.e., that the requested accommodation was "'(1) reasonable and (2) necessary to (3) afford handicapped persons an equal opportunity to use and enjoy housing.'" Lapid-Laurel, 284 F.3d at 457 (quoting Bryant Woods Inn, Inc. v. Howard County, 124 F.3d 597 (4th Cir. 1997)).

## V. Conclusion

For the reasons set forth above, we will REVERSE the judgment of the District Court and REMAND for further proceedings consistent with this opinion.

_____